JOHN ERICKSON, PLAINTIFF–APPELLANT, v. MARSH & MCLENNAN CO., INC., DEFENDANT–RESPONDENT.

Argued September 11, 1989—Decided February 5, 1990.

540

*Frank J. Peterpaul* and *Michael Critchley* argued the cause for appellant (*Critchley & Roche,* attorneys).

*Cynthia M. Jacob* argued the cause for respondent (*Collier, Jacob & Sweet*, attorneys; *Alan G. Lesnewich* and *Christopher H. Mills*, on the briefs).

*Jeffrey C. Burstein*, Deputy Attorney General, argued the cause for *amicus curiae*, New Jersey Division on Civil Rights (*Peter N. Perretti, Jr.*, Attorney General of New Jersey, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents an unusual question of what constitutes a cognizable claim of reverse sex discrimination under the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42 (LAD). Plaintiff John Erickson claims he was the victim of sexual discrimination in that his employer, defendant Marsh & McLennan Co., Inc. (M & M) discharged him because of a romantic consensual relationship between his supervisor and a female employee. This appeal also addresses whether an employer, in responding to inquiries from prospective employers concerning a former employee, has a qualified privilege protecting it from a libel action.

I

On November 2, 1981, M & M hired Erickson as an "at-will" employee and assigned him to the company's Morristown Office as an account representative in the Major Accounts Casualty Department. In May 1982, the company transferred Erickson to the Commercial Accounts Department as an account executive. Erickson asserts that this transfer was a promotion because an account executive enjoys a higher job category than account representative. Several executives from M & M, however, testified that Erickson had been unilaterally transferred from the largest and most prestigious department to a smaller

and less prestigious department, at the same salary, because he had failed to grasp certain technical aspects of his job.

In his new position, Erickson's supervisor was Angela Kyte, an Assistant Vice President and the Manager of Commercial Accounts. Kyte's supervisor was Frank Hayes, a Vice–President and Operations Manager of the Morristown Office. Erickson was the "team leader" of Karen Niedhammer, an account representative, and Stuart Torbert, an insurance assistant.

The events leading to the lawsuit began in February 1983. On February 8, 1983, Niedhammer and a colleague, Kelly Lennan, met with Kyte in her office. Niedhammer reluctantly reported that on several occasions Erickson had sexually harassed her. On February 10, 1983, Hayes had dinner with Lennan, Niedhammer, and a friend of Lennan. During dinner, Niedhammer told Hayes that Erickson had acted inappropriately towards her. Niedhammer essentially informed Hayes of the incidents she had reported to Angela Kyte on February 8, 1983.

The M & M office closed early the next day due to a severe snowstorm. Several M & M employees, including Hayes, Lennan and Niedhammer, went to a local restaurant for drinks. Because of bad road conditions, Hayes drove Lennan and Niedhammer to Niedhammer's home, where Lennan was staying while Niedhammer's husband was away. Unable to remove his car from the snow, Hayes stayed at Niedhammer's home for the night. The next day he drove Lennan back to her car at the restaurant.

The following Monday, February 14, 1983, Kyte and Hayes met to discuss Niedhammer's allegations. Kyte prepared a memorandum regarding that meeting:

> [Hayes] wants to know what I plan to do about it. [I] told him I was not sure, but had planned to talk to John about it and cool him off. Frank called [Ed] Pazicky, [Richard] Mikulak, personnel for advice. Pazicky said do something fast and either fire or give threat of firing if actions continue.

After the meeting, Hayes instructed Kyte to question other female employees discreetly to determine whether Erickson had ever sexually harassed them. Two women reported that Erick-

son had previously made improper gestures and comments to them.

The next day, Kyte met with Erickson to discuss the allegations made against him. According to Kyte, Erickson admitted the acts but stated that he had intended them only as a joke. A memorandum that Kyte wrote to Erickson recounted the meeting:

John, confirming our discussions of this morning, your behavior towards your subordinate, Karen Niedhammer, and other female members of the department has included incidents, actions and comments which are unprofessional in nature and can only be interpreted as a form of sexual harassment.

\* \* \* \* \* \* \* \*

I have expressly instructed you to stop any such conduct as physical contact and suggestive comments, whether joking or not, and to avoid and prevent any situations which can be interpreted as sexual harassment in the future. Further, you are not in any way to mention this matter to Karen or bring it up to her in any way.

\* \* \* \* \* \* \* \*

Should there by any further incidents of this nature or breach of the above ban it will be considered grounds for termination.

A copy of this memo is being entered in your personnel file.

After receiving the memorandum, Erickson consulted an attorney. His lawyer, Michael Critchley, sent a letter dated March 10, 1983 to Kyte stating that Erickson denied every accusation and wished to discuss the matter. According to Kyte, she had not been aware that Erickson was contesting the sexual-harassment allegations until she received Critchley's letter.

Kyte referred Critchley's letter to Hayes, who forwarded it to Frank Cooper, Assistant Vice President and Manager of M & M's Employee and Government Relations Department in New York. After reviewing the matter, Cooper sent Critchley a letter dated March 31, 1983, stating:

We recognize the seriousness and sensitivity of the issue and assure you that as long as there are no further thematic recurrences attributable to your client and he complies with the proscriptions of Ms. Kyte's February 15th memorandum, the matter is closed.

He also advised Critchley that all documents concerning the sexual harassment charge would be kept separate from Erickson's personnel file. In an April 18, 1983 letter to Cooper, Critchley reiterated his request for a conference and specifically requested "an opportunity to confront Ms. Niedhammer for the purposes of refuting the validity of her charges and thereafter having the matter closed." Cooper denied this request in a letter to Critchley of May 3, 1983:

> I see no benefit to be derived from the confrontation you suggest. Furthermore, in our view such an undertaking would be disruptive to the working environment. Consequently, I ask you to encourage your client to put this matter behind him as we have, and go forward with the work at hand.

Cooper also advised Critchley that he had asked the Morristown Office to forward all documentation concerning the matter to him so that he could store it in his confidential file. Cooper explained that putting the document in that file, which would not be available to management, would "virtually reduce to zero the probability of anyone drawing negative inferences in the future from a review of Mr. Erickson's file."

On May 2, 1983, Kyte prepared a formal appraisal of Erickson in which she evaluated his performance as falling between "acceptable" and "inadequate." She did not, however, recommend his discharge. On May 9, 1983, Erickson responded to Kyte's appraisal report:

> I am very distressed over the contents of this report and I am in total disagreement with it. I do not view this report as an objective assessment of my knowledge and skills, but a prejudicial view which is motivated as a result of my response to the recent allegations brought against me.
>
> The alleged deficiencies contained within the report were never brought to my attention since the inception of my employment with Marsh and McLennan, Inc. Further, no where within the report is there any mention, nor is it implied, that I had been previously advised of said alleged deficiencies.
>
> I find it highly coincidental that such allegations are forth coming at this time. Surely, my knowledge, skills and abilities have not dissipated since I began my employment with Marsh & McLennan and, most certainly, not since my retention of legal counsel became known to Marsh and McLennan in March of 1983.

After receiving the response, Kyte concluded that Erickson's unwillingness to acknowledge his deficiencies would prevent him from responding favorably to her "constructive criticism."

According to a memo prepared by Kyte, Erickson's response was the "final catalyst which convinced me once and for all that no amount of critique or constructive criticism was going to be acted upon for the benefit of improving John Erickson's work performance."

Subsequently Kyte consulted with Hayes and recommended Erickson's termination. Hayes then communicated with the head of the New Jersey operation, Roger Egan, of the New York Office. Having worked with Erickson in the past, Egan had criticized his work on a project in which Kyte had to rewrite an entire report. Egan, Hayes and Kyte agreed that Erickson should be discharged, and on May 20, 1983, Hayes fired Erickson. Niedhammer did not replace Erickson.

After his termination, Erickson sought employment with other insurance-brokerage firms. Howard James Insurance Services, Inc., and Joseph L. Iraci Insurance Agency asked M & M for references. Howard James Insurance Services, Inc. stated that the job for which they were considering Erickson "entails a general knowledge of all lines of insurance along with general abilities to deal with the public and a strong organization ability." They inquired whether M & M would recommend Erickson for such a position and the reason for his discharge.

In response to this inquiry, Kyte wrote:

John left our operation because his level of expertise and areas of interest in insurance did not match the depth required for the proper service of [M & M] clients.

She added, however, that

John does possess a general knowledge of commercial insurance and is well known among the insurance markets. If these are qualities you are seeking for your Account Executive position, we would recommend John Erickson to you.

Kyte's response to Joseph L. Iraci Insurance Agency's inquiry for "any information" regarding Erickson's past history and performance was similar to her response to Howard James Insurance Services, Inc.

In August 1983 Erickson accepted employment with another insurance agency.

Later that month Erickson sued M & M for various wrongful acts committed during and after his term of employment. His allegation was that M & M had discriminated against him on the basis of sex, in violation of LAD. Specifically, he claimed that he was wrongfully accused of sexual harassment so that Hayes, his superior, could promote a woman, Niedhammer, with whom Hayes had been romantically involved (the paramour claim). He also alleged that he had been wrongfully discharged against public policy for having retained an attorney to defend him against Niedhammer's charges of sexual harassment (the retaliation claim). Erickson further charged that Kyte's responses to his prospective employers had been libelous. A jury found M & M liable of wrongful discharge in violation of public policy, wrongful termination based on sex discrimination in violation of LAD, and libel.[1] A jury awarded Erickson $250,000 in compensatory damages and $750,000 in punitive damages.

M & M moved for a judgment notwithstanding the verdict or in the alternative, for a new trial or remittitur. The trial court denied that motion. On appeal, the Appellate Division reversed the trial court, and entered judgment in favor of M & M on all claims. 227 *N.J.Super.* 78 (App.Div.1988). We granted plaintiff's petition for certification, 113 *N.J.* 640 (1988).

## II

The gravamen of Erickson's claim is that his discharge was a result of sex discrimination, in violation of the New Jersey Law Against Discrimination (LAD). Relying on the pronouncements of the United States Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973), concerning the establishment of a *prima facie* case of discrimination under federal law, this Court announced a

---

[1]Erickson's claim of tortious interference with his prospective economic advantage was dismissed at the end of defendant's case and his claim of interference with contractual rights was dismissed on defendant's motion for summary judgment.

four-part analysis to be applied in LAD actions, beginning with our decisions in *Peper v. Princeton University Board of Trustees,* 77 *N.J.* 55, 82–83 (1978), and followed thereafter in *Goodman v. London Metals Exchange Inc.,* 86 *N.J.* 19, 31 (1981); *Andersen v. Exxon Co.,* 89 *N.J.* 483, 492 (1982); and *Clowes v. Terminix International, Inc.,* 109 *N.J.* 575, 595 (1988).

In *Andersen* we explained that a *prima facie* case of unlawful discrimination is established when

[t]he plaintiff [ ] demonstrate[s] by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. [89 *N.J.* at 492 (citing *McDonnell Douglas, supra,* 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677).]

Once an employee establishes a *prima facie* case, the employer must "articulate some legitimate, non-discriminatory reason for the employee's rejection." *Andersen, supra,* 89 *N.J.* at 493 (quoting *Goodman v. London Metals Exchange, Inc., supra,* 86 *N.J.* at 31; *Peper v. Princeton University Board of Trustees, supra,* 77 *N.J.* at 83). After the employer has satisfied that burden, the employee must demonstrate that "the legitimate nondiscriminatory reason articulated ... was not the true reason for the employment decision, but was merely a pretext for discrimination." *Ibid.* (quoting *Goodman v. London Metals Exchange Inc., supra,* 86 *N.J.* at 32, *Peper v. Princeton University Board of Trustees, supra,* 77 *N.J.* at 83). The employee carries the ultimate burden of proving that the employer engaged in intentional discrimination. *Ibid.*

We have recognized, however, that the criteria announced in *Peper, Goodman,* and *Andersen* provide only a general framework for analyzing unlawful discrimination claims and must be modified where appropriate. *Clowes v. Terminix International, Inc., supra,* 109 *N.J.* at 597. Thus, when faced with a discriminatory *discharge* case, we examined the reasoning set forth in *Loeb v. Textron,* 600 *F.*2d 1003 (1st Cir.1979), and determined that a *prima facie* case is established when an

employee proves: "[1] that he was in the protected * * * group, [2] that he was performing his job at a level that met his employer's legitimate expectations, [3] that he nevertheless was fired, and [4] that [the employer] sought someone to perform the same work after he left." *Clowes v. Terminix International, Inc., supra,* 109 *N.J.* at 597 (quoting *Loeb v. Textron, supra,* 600 *F.*2d at 1014).

We are asked here to determine the appropriate criteria for evaluating a gender-based claim of reverse employment discrimination. Modifying the *Clowes* test, the Appellate Division ruled that under the first prong, plaintiff "must substantiate ... that the 'background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" *Erickson, supra,* 227 *N.J.Super.* at 87 (citing *Murray v. Thistledown Racing Club Inc.,* 770 *F.*2d 63, 67 (6th Cir.1985)). We agree that such modification is necessary.

Under the first prong of the *Clowes* test, a plaintiff must belong to a protected class. 109 *N.J.* at 596 (quoting *McDonnell Douglas v. Green, supra,* 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677). The rationale underlying this requirement, derived from its federal counterpart, Title VII of the Civil Rights Act of 1964, 42 *U.S.C.* § 2000e et seq., reflects "[c]ongressional efforts to address this nation's history of discrimination against racial minorities, a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effect." *Murray v. Thistledown Racing Club Inc.,* 770 *F.*2d at 67. In reverse discrimination cases, the rationale supporting the rebuttable presumption of discrimination embodied in the *prima facie* elements does not apply. Thus, when a complainant is not a member of the minority, courts have generally modified the first prong of the *McDonnell Douglas* standard to require the plaintiff to show that he has been victimized by an "unusual employer who discriminates against the majority." *Livingston v. Roadway Express,* 802 *F.*2d 1250, 1252 (10th

Cir.1986); *Murray v. Thistledown Racing Club, Inc., supra,* 770 *F.*2d at 67; *Jasany v. United States Postal Serv.,* 755 *F.*2d 1244, 1252 (6th Cir.1985); *Parker v. Baltimore & Ohio R.R.,* 652 *F.*2d 1012, 1017 (D.C.Cir.1981); *Jones v. Slater Steels Corp.,* 660 *F.Supp.* 1570, 1575 (N.D.Ind.1987); *Rivette v. United States Postal Serv.,* 625 *F.Supp.* 768, 771 (E.D.Mich.1986). Indeed, when a complainant is a member of the majority and not representative of persons usually discriminated against in the work place, discrimination directed against that person is "unusual."

In this case, Erickson is a member of a class that has not historically been victimized by discrimination. Thus, modification of the *McDonnell–Douglas* first-prong is appropriate. In other cases, however, our approach may require clarification. There may be examples of discrimination against a generally favored group that may not be uncommon, but nevertheless should be regarded as "unusual." *See, e.g., Rasimas v. Michigan Dept. of Mental Health,* 714 *F.*2d 614, 630 (6th Cir.1983) (Hoffman, J., concurring in part, dissenting in part) (male terminated from his position in a program for handicapped children held to be gender-based discrimination: "[t]he same ... stereotypes that have caused women to be channeled either away from the job marketplace altogether or into lower-paying jobs ... necessarily have their counterparts in male ... stereotypes.").

Erickson claims that he was discharged so that his supervisor's female paramour could be promoted. Erickson also points to the prior discharge of his insurance assistant Stuart Torbert, as evidence of Hayes' motivation to replace male employees with female employees he favored. Erickson concludes from this that to "get ahead" in M & M, one must be female. The paramour claim, together with the singular incident of replacing Torbert with a female, is insufficient to demonstrate that M & M is the unusual employer who discriminates against the majority. Beyond these two incidents, Erick-

son proferred no evidence that M & M engaged in a pattern of sex discrimination that favored women over men. Indeed, the large number of male supervisors at M & M that testified on behalf of the company suggests otherwise. Hence, the claims asserted under Erickson's first theory, even if accepted as true, do not satisfy the first prong of our modified test.

■ The Appellate Division also modified the fourth prong of the *Clowes* test to require a plaintiff to show that "his former employer dismissed him in order to give preference to a woman of equal or lesser qualifications." 227 *N.J.* at 87 (footnote omitted). We hold that such a modification in a reverse discrimination case is inappropriate.

Modifying the *Andersen* formulation for a discriminatory discharge case, we determined in *Clowes* that a plaintiff claiming a LAD violation must demonstrate only "that [the employer] sought someone to perform the same work after he left." *Clowes v. Terminix International, Inc.,* 109 *N.J.* at 597 (quoting *Loeb v. Textron, supra,* 600 *F.*2d at 1014). The *Clowes* framework allows the inference to arise that discrimination has occurred by "eliminat[ing] the most common non-discriminatory reasons for the plaintiff's rejection." *Texas Department of Community Affairs v. Burdine,* 450 *U.S.* 248, 254, 101 *S.Ct.* 1089, 1094, 67 *L.Ed.*2d 207, 215–16 (1981). As the First Circuit in *Loeb v. Textron, supra,* reasoned:

> Complainant would be required to show that he was "qualified" in a sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative. He would also have to show that his employer sought a replacement with qualifications similar to his own, *thus demonstrating a continued need for the same services and skills . . . .* Proof beyond this, however, is not mandated by *McDonnell Douglas,* and does not fit its conceptual underpinnings. . . .
>
> [600 *F.*2d at 1013–14 (citation and footnote omitted) (emphasis added).]

In analyzing various claims of discrimination under LAD, this Court has also adopted the fourth prong as set forth in *McDonnell–Douglas. See Andersen v. Exxon Co., supra,* 89 *N.J.* at 492 (in a physical handicap case, a plaintiff must demonstrate that the employer continued to seek applications from persons

of plaintiff's qualifications); *Clowes v. Terminix International Inc., supra,* 109 *N.J.* at 597 (when alcoholism is a handicap, plaintiff must demonstrate that the employer sought someone else to perform the same work after he left); *Goodman v. London Metals Exchange, Inc., supra,* 86 *N.J.* at 31 (in sex discrimination case, plaintiff must show that after rejection, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications).

To require, in a reverse discrimination case, an employee to show that the employer hired another person of equal or lesser qualifications is unduly burdensome and an inappropriate modification of the fourth *prima facie* element. That a replacement employee is equally or more qualified than his predecessor is not as "common" a basis for discharge as lack of need for the employee's services or job performance deficiencies. Additionally, it is easier for an employer than an employee to produce evidence of the replacement's qualifications to support its nondiscriminatory reason for a discharge. To impose such a requirement on employees would promote rather than prevent employment discrimination. It would eliminate meritorious claims that frequently challenge discrimination based on hidden motives or pretext.

 Although the Appellate Division improperly modified the fourth element, it nonetheless found that "plaintiff's proof, given its favorable inferences, nevertheless fails to demonstrate who[m] defendant sought to replace plaintiff, and which *if any* of the current account executives took plaintiff's place to do the same work." 227 *N.J.Super.* at 88. Significantly, the court noted that Niedhammer did not replace Erickson. *Id.* at 84. The Appellate Division thus concluded that "the lack of such proofs precludes the required *prima facie* showing." *Id.* at 88. We agree.

Under the less burdensome standard we endorse today, we also find that Erickson has failed to meet his *prima facie* burden with respect to the fourth element. The record fails to

disclose M & M's course of action following Erickson's termination. Erickson offered no evidence that M & M had sought a woman to perform the same work after he left. He relied instead on the fact that prior to his discharge there had been three account executives in the department and at the time of trial there were four. Such a change in personnel, without a more specific showing that M & M sought to replace Erickson with either Niedhammer or another qualified female account executive is insufficient to satisfy the fourth element of our test.

Although the Appellate Division properly determined that the "critical issue in this case was not sexual harassment, but intentional sex discrimination," 227 *N.J.Super.* at 89 n. 3, plaintiff's allegations require us to examine sexual harassment in the context of his LAD claim. Erickson's first theory is unusual. He does not claim that he was the direct victim of sexual harassment. Instead, he contends that he was falsely accused of sexual harassment so that his superior's alleged girlfriend could be promoted to his position. Erickson does not claim that the relationship between Hayes and Niedhammer was involuntary or coercive. Stated differently, he does not contend that his discharge was the result of the sexual harassment of another employee, namely, Niedhammer. Indeed, throughout his case Erickson asserts that Hayes' alleged relationship with Niedhammer was voluntary, social, personal, and noncoercive.

■ In its amicus brief, the Division of Civil Rights (DCR) asserts that for purposes of establishing a sex discrimination claim, there is a clear distinction between a non-actionable consensual relationship and one based on coercion. Specifically, it notes that sexual harassment that either requires an employee to submit to sexual advances as a condition of employment or creates a "hostile environment" by unwelcome sexual conduct violates LAD's prohibition against sex discrimi-

nation.[2] *See, e.g., Wolbert v. Styhlianos, Inc.,* 9 *N.J.A.R.* 392 (1985); *Vasto v. Vornado Inc.,* 8 *N.J.A.R.* 481 (1983). DCR reasons that LAD offers protection against such conduct because the harassment would not have occurred but for the employee's gender. DCR also explains that such sexual harassment presents a formidable barrier to LAD's goal of achieving equal employment opportunity. To the extent that a claim of sexual harassment is based on "submission" or "coercion," we find that it is prohibited by LAD.

In construing analogous provisions of federal law, the United States Supreme Court also recognized that sexual harassment can form the basis of a Title VII claim. See *Meritor Savings Bank v. Vinson,* 477 *U.S.* 57, 106 *S.Ct.* 2399, 91 *L.Ed.*2d 49 (1986). In *Meritor* the Court recognized that a Title VII claim may exist when employment is conditioned on sexual favors or unwelcome sexual contact that creates an intimidating, hostile or offensive environment. 477 *U.S.* at 65, 106 *S.Ct.* at 2404, 91 *L.Ed.*2d at 58. The Court reasoned that "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminates' on the basis of sex," in violation of Title VII. *Id.* at 64, 106 *S.Ct.* at 2404, 91 *L.Ed.*2d at 58. In so ruling, the Court drew from the Equal Employment Opportunity Commission's (EEOC) Guidelines on Discrimination, 29 *CFR* § 1604.11(a), which recognize those types of sexual harassment as a prohibited form of discrimination. 477 *U.S.* at 65, 106 *S.Ct.* at 2404–05, 91 *L.Ed.*2d at 58–9. Prior to *Meritor,* lower federal courts had also recognized sexual harassment claims under Title VII. *See, e.g., Henson v. City of Dundee,* 682 *F.*2d 897, 901 (11th Cir.1982) (under certain circumstances creation of offensive or hostile work environment due to sexual harassment can violate a Title VII action irrespective of whether complainant suffers tangible job detriment);

---

[2]There is currently pending before the New Jersey Legislature an amendment to LAD that would make sexual harassment an unlawful employment practice. See Senate No. 1527.

*Tomkins v. P.S.E. & G.*, 568 *F.*2d 1044, 1048–49 (3rd Cir.1977) ("Title VII is violated when a supervisor * * * makes sexual advances or demands toward a subordinate employee and conditions that employee's job status * * * on a favorable response to those advances or demands * * * "). In sum, discrimination claims based on sexual harassment have been limited to those situations in which "but for her [or his] sex she [or he] would not have been the object of harassment," *Henson, supra,* 682 *F.*2d at 904, and the sexual relationship is involuntary, non-consensual, and/or coercive.

We also note that both the EEOC Guidelines and the DCR policy recognize that in certain circumstances a third party may bring a claim of sexual harassment. *See* 29 *CFR* 1604.11(g) (1986).[3] Both agencies note, however, that such claims must be premised on the "submission" by another employee to an employer's sexual advances, and require proof of coercion or harassment by a third party denied an employment opportunity because of that coercion or harassment.

 Erickson's claim of sexual harassment is unusual. He claims that sexual harassment charges brought against him were fabricated and that he was discharged so that his supervisor's paramour could be promoted. To be a valid third-party allegation of sexual harassment, his claim requires proof of coercion by Hayes against Niedhammer. He has not proffered evidence of such coercion. The adverse employment action allegedly resulted from a consensual, non-coercive relationship between Hayes and Niedhammer. As such, it is insufficient to establish a claim of sexual harassment. More importantly, we find no reason to extend the protection of LAD to sex-discrimination claims based on voluntary personal relations in the work place.

---

[3] The DCR policy concerning third party sexual harassment is contained in its pamphlet entitled *Employer's Guide to the New Jersey Law Against Discrimination.* It is not included in pending legislation. *See* Senate No. 1527.

Other courts have recognized that favoritism in the work place, based solely on personal romantic preference as opposed to coercion, does not constitute discrimination on the basis of gender. *See, e.g., DeCintio v. Westchester County Medical Center,* 807 *F.*2d 304 (2d Cir.1986). In *DeCintio,* four medical employees brought a Title VII action against their employer alleging that a department administrator created a new position, with qualifications above the plaintiff's, solely to enable the administrator to hire a woman "with whom he was engaged in a romantic relationship." *Id.* at 305. Finding that the hospital had not engaged in unlawful sex discrimination, the Second Circuit reasoned that "the proscribed differentiation under Title VII, * * * must be a distinction based on a person's sex, not on his or her sexual affiliations." *Id.* at 306–07. Thus, the court held that advancement or promotion on the basis of a consensual sexual relationships could not support a sex-discrimination claim.

The *DeCintio* court noted that for third-party claims the EEOC guidelines regarding sexual harassment require proof of *submission* by an employee to sexual advances of an employer. *Id.* at 307 (citing 29 C.F.R. § 1604.11(g) (1986)). The court noted that "submission" in that context surely "involves a lack of consent and implies a necessary element of coercion or harassment." *Id.* at 308. The *DeCintio* court reasoned that plaintiffs had failed to establish a case of sexual harassment because they did not even allege that the administrator and his paramour were engaged in a coercive relationship. *Ibid.*

The court concluded that even if the defendant's relationship with his co-worker facilitated her advancement, such conduct did not violate Title VII because the plaintiffs "were not prejudiced because of their status as males; rather they were discriminated against because [defendant] preferred his paramour." *Id.* at 308. The court added: "Plaintiffs' proffered interpretation of Title VII prohibitions against sex discrimination would involve the * * * federal courts in the policing of intimate relationships. Such an approach, founded on a distor-

tion of the meaning of the word 'sex' in the context of Title VII, is both impractical and unwarranted." *Ibid.*

Several courts have followed the Second Circuit. *See, e.g., Autry v. North Carolina Department of Human Resources,* 820 *F.*2d 1384, 1387 (4th Cir.1987) ("a voluntary ongoing friendship would be an inappropriate basis for a Title VII suit"); *Miller v. Aluminum Co. of America,* 679 *F.Supp.* 495, 501 (W.D.Pa.1988) (under Title VII, "preferential treatment on the basis of a consensual romantic relationship between a supervisor and an employee is not gender-based discrimination"); *Lipsett v. Rive–Mora,* 669 *F.Supp.* 1188, 1199–1200 (D.P.R.1987) (distinguishing between advances resulting from personal, romantic attraction and sexual demands for employment advancement or promotion); *Polk v. Pollard,* 539 *So.*2d 675, 677–78 (La.App.1989) (Louisiana discrimination statute does not recognize cause of action for discharge resulting from sexual relationship between two other persons).

Even assuming that Erickson's allegations under his "paramour" claim are true, he has failed to establish a *prima facie* case of sex discrimination. As with the plaintiffs in *DeCintio,* he has not alleged that the relationship between Hayes and Niedhammer was coercive. Thus, he cannot assert that he was discharged *because* of his status as a male. Had Erickson been a female account executive at M & M, he would have faced the same consequences: Hayes would have terminated Erickson in order to create a vacancy for a woman with whom Hayes had established a consensual, voluntary and non-coercive relationship. Indeed, if Hayes did wish to promote his paramour, it would be a matter of complete indifference to him whether his paramour's rival, Erickson, were male or female.

Likewise, Erickson's second theory does not establish a cognizable claim under LAD. Plaintiff alleges that he was terminated because he hired an attorney to defend him against Niedhammer's sexual-harassment charges (the retaliation charge). Federal law mandates that an employer can be held

liable for sexual harassment that occurs between fellow employees "unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. ¶ 1604.11(d). Knowing of a sexual-harassment claim, an employer's failure to investigate and take remedial action can subject the employer to liability. *Craig v. Y & Y Snacks,* 721 *F.*2d 77, 80–1 (3rd Cir.1983). In its brief, *amicus* states that the DCR also has held that an employer must take expeditious remedial action when confronted with an employee's claim of sexual harassment. *Vasto v. Vornado, supra,* 8 N.J.A.R. at 496. *Amicus* finds that the obligation imposed on an employer is a primary source of the deficiency in Erickson's retaliation claim.

The central element of a retaliatory discharge claim under LAD is that the plaintiff be "engaged in a protected activity, which is known by the alleged retaliator." *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 193 n. 1 (1988). An employee defending himself against charges that he or she sexually harassed a co-worker is not engaged in "protected activity." To support Erickson's claim, an employer would be exposed to suit regardless of whether it properly attempted remedial action in investigating a sexual harassment allegation or whether it did nothing.

Moreover, an employer has an absolute right to discharge an "at-will" employee even if that employee has retained a lawyer to protest the employer's actions—provided only that the employer not violate any clear mandate of public policy. *Alexander v. Kay Finlay Jewelers,* 208 *N.J.Super.* 503, 507–08 (App.Div.), certif. denied, 104 *N.J.* 466 (1986); *see Woolley v. Hoffman–LaRoche Inc.,* 99 *N.J.* 284, *modified,* 101 *N.J.* 10 (1985); *Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58 (1980). A decision to terminate an "at-will" employee who has adversely reacted to management's criticism does not constitute discrimination based on gender. Rather, it is a legitimate, non-discriminatory method of handling the daily operations of a business. *See Kephart v. Institute of Gas Technology,* 630

*F.*2d 1217, 1223 (7th Cir.1980), *cert. denied,* 450 *U.S.* 959, 101 *S.Ct.* 1418, 67 *L.Ed.*2d 383 (1981).

█ With respect to Erickson's sex-discrimination claim under LAD,. we conclude that even if Hayes fabricated the sexual-harassment charge to promote Niedhammer because of his romantic involvement with her, such actions, although unfair, do not constitute discrimination on the basis of gender. Plaintiff did not demonstrate that M & M was the unique employer who discriminates against the majority. Nor did he demonstrate that Niedhammer, or any other woman, replaced him at M & M. Additionally, he did not allege that the relationship between Hayes and Niedhammer was coercive in nature, a prerequisite to bring a third-party sexual-harassment. In sum, Erickson produced no evidence that if he had been a woman, he would not have been fired.

Likewise, Erickson's second theory that he was fired because he had hired a lawyer to dispute the sexual-harassment claim does not constitute gender discrimination. His actions in that regard cannot be considered a "protected activity." Moreover, based on plaintiff's reaction to management criticism, M & M had the right to terminate his employment. A "contentious" "at-will" employee can be fired for a false cause or no cause at all. That firing may be unfair but it is not illegal. Accordingly, we find that as a matter of law Erickson's complaints do not constitute sex discrimination.

### III

Plaintiff also asserts that pursuant to *Pierce v. Ortho Pharmaceutical Corp., supra,* 84 *N.J.* at 72 his gender-based discharge is contrary to the public policy of this state. That claim relies entirely on the sex-discrimination allegations underlying his LAD claim. Because we find that Erickson failed to establish that he had been discharged in violation of LAD, we need not consider whether his discharge violated public policy. Nonetheless, we note that although the Appellate Division held

that had Erickson failed to meet his *prima facie* burden under LAD, it also ruled that LAD does not preempt a common-law claim for wrongful discharge based on sex discrimination. Because no cross-petition was filed, we do not reach that issue. Rather, we reaffirm what we recently declared in *Shaner v. Horizon Bancorp.*, 116 *N.J.* 433 (1989): if LAD creates a remedy, "it might be unnecessary to recognize or create a *Pierce* -type action to vindicate substantially the same rights and provide similar relief." *Id.* at 454. Thus, we review in this case Erickson's sex-discrimination claim under LAD and his libel action.

## IV

With respect to the libel claim, the trial court ruled that a qualified privilege extended to Kyte's responses to the inquiries of Erickson's prospective employers. The trial court instructed the jury that to overcome that privilege, Erickson must demonstrate by a preponderance of the evidence that Kyte had acted with actual malice when sending the letters. Without reaching the issue of the appropriate burden of proof, the Appellate Division held that the evidence did not support a finding of abuse of privilege. 227 *N.J.Super.* at 91.

We agree that a qualified privilege extends to an employer who responds in good faith to the specific inquiries of a third party regarding the qualifications of an employee. Because the trial court incorrectly charged the jury on the burden of proof necessary to overcome a qualified privilege, however, we reverse so much of the Appellate Division's judgment as affects the libel claim and remand for a new proceeding.

The law of defamation has been subject to the changing tides of public policy. As we noted in *Dairy Stores v. Sentinel Publishing Co.*, 104 *N.J.* 125 (1986), "The evolution of the law of defamation reflects the tension between society's competing interests in encouraging the free flow of information about matters of public concern and in protecting an individual's

reputation." *Id.* at 135–36. There, in ruling on the scope of the fair-comment privilege, we noted that this development is "consistent with the increasing awareness of the need for public information on a wide variety of issues." *Id.* at 136.

■ Although defamatory, a statement will not be actionable if it is subject to an absolute or qualified privilege. A statement made in the course of judicial, administrative, or legislative proceedings is absolutely privileged and wholly immune from liability. See *Rainier's Dairies v. Raritan Valley Farms,* 19 *N.J.* 552, 558 (1955). That immunity is predicated on the need for unfettered expression critical to advancing the underlying government interest at stake in those settings. *See Dairy Stores v. Sentinel Publishing Co., supra,* 104 *N.J.* at 136; *Rainier's Dairies v. Raritan Valley Farms, supra,* 19 *N.J.* at 558.

■ A qualified privilege, on the other hand, enjoys a lesser degree of immunity and is overcome on a showing of actual malice. Specifically, in *Coleman v. Newark Morning Ledger Company,* 29 *N.J.* 357 (1959), Chief Justice Weintraub addressed the nature and scope of that privilege:

A communication 'made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable. . . .'

[*Id.* at 375].

This qualified or conditional privilege is based on the public policy "that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public." Introductory Note, *Restatement (Second) of Torts,* § 592A, at 258 (1965) (*Restatement (Second)*).

In order to protect those interests, both public and private, we have recognized the utility of a qualified privilege in a variety of settings. *See, e.g., Fees v. Trow,* 105 *N.J.* 330 (1987) (an employee of a state facility for the disabled has qualified

privilege in making report of another employee's abuse of resident); *Holh v. Mettler,* 62 *N.J.Super.* 62 (App.Div.1960) (property owners have qualified privilege in commenting about potential health problems resulting from proposed trailer park); *Swede v. Passaic Daily News,* 30 *N.J.* 320 (1959) (newspapers enjoy qualified privilege to report on public proceedings). In such cases, a qualified privilege exists because the legitimate public or private interest underlying the publication outweighs the important reputation interests of the individual. *Dairy Stores v. Sentinel Publishing Co., supra,* 104 *N.J.* at 137.

We recognize that Erickson does not dispute that Kyte's communications to his prospective employers are subject to a qualified privilege. Recently, in *Bainhauer v. Manoukian,* 215 *N.J.Super.* 9 (1987), the Appellate Division considered whether a qualified privilege extended to a surgeon for statements made to various hospital executives concerning the responsibility of an anesthesiologist for the death of a patient. After reviewing the development of the law in this state, the court offered the following guidance for determining whether a qualified privilege should be conferred:

[T]he critical test of the existence of the privilege is the circumstantial justification for the publication of the defamatory information. The critical elements of this test are the appropriateness of the occasion on which the defamatory information is published, the legitimacy of the interest thereby sought to be protected or promoted, and the pertinence of the receipt of that information by the recipient.

[*Id.* at 36–37].

Applying that criterion, we hold that a qualified privilege extended to Kyte for the statements she made to Erickson's prospective employers. Her publication was made in response to inquiries of those employers and was not simply volunteered. Additionally, those prospective employers had a legitimate and obvious interest in the professional qualifications, skill, and experience of Erickson, including the reasons for his termination. Moreover, the information Kyte offered specifically addressed the questions posed by those employers; her publica-

tion was directly relevant to their inquiry. *Supra* at 548. Thus, a qualified privilege appropriately shielded her responses.

Other courts have conferred a qualified privilege to an employer in this context. *See, e.g., Fresh v. Cutter,* 73 *Md.* 87, 20 A. 774 (1890); *Doane v. Grew,* 220 *Mass.* 171, 107 *N.E.* 620 (1915); *Carroll v. Owen,* 178 *Mich.* 551, 146 *N.W.* 168 (1914).

▮ Having ruled that a qualified privilege protected Kyte's letters, we now turn to the standards for determining whether that privilege was abused. At general common law a qualified privilege could be overcome only by a showing of "ill motive or malice in fact." *Rainier's Dairies v. Raritan Valley Farms, supra,* 19 *N.J.* at 558. The term "malice," however, has been criticized for its susceptibility to varied interpretations and "has plagued the law of defamation from the beginning." *Coleman v. Newark Morning Ledger Company, supra,* 29 *N.J.* at 374. Recognizing that "[m]alice adds nothing to the legal analysis of an allegedly defamatory statement," we recently adopted a more workable standard:

> Although we discard the label [of malice], we adhere to the principle that to overcome a qualified or conditional privilege, a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity....
>
> With or without the term, the critical determination is whether, on balance, the public interest in obtaining information outweighs the individual's right to protect his or her reputation.
>
> [*Dairy Stores v. Sentinel Publishing Co., supra,* 104 *N.J.* at 151 (citing *Restatement (Second),* § 600; *Coleman v. Newark Morning Ledger Company, supra,* 29 *N.J.* at 376).]

We have also declared that proof of malice in·the context of a qualified privilege must be established by clear and convincing evidence. *See Burke v. Deiner,* 97 *N.J.* 465, 481 (1984) (quoting *New York Times v. Sullivan,* 376 *U.S.* 254, 280, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706 (1964)); *Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 197 n. 10 (1982) (citing *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 342, 94 *S.Ct.* 2997, 3008, 41 *L.Ed.*2d 789, 808 (1974)). Indeed, the imposition of a lesser burden of

proof would fail to adequately protect the interests underlying the privilege.

We recognize that if the letters were true, Erickson's claim fails because truth is a defense to charge of libel. *Laurence v. Bauer Publishing & Printing*, 89 *N.J.* 451, 460 *cert. denied*, 459 *U.S.* 999, 103, *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982). Likewise, if Kyte believed in good faith that the charges were true, the claim fails because she was not acting with actual malice. We recognize that the Appellate Division found, under the less burdensome preponderance-of-the-evidence standard, that Erickson had failed to prove that Kyte acted with actual malice. Specifically, the court found: "Kyte gave her honest, professional opinion in a manner consistent with the interest of the prospective employers. There is no suggestion of any knowledge of falsity nor of a reckless disregard as to truth or falsity." 227 *N.J.Super.* at 91.

In reversing the libel count, the Appellate Division reasoned: "[P]laintiff's only proof of wrongful motivation [malice] went to the issue of discharge, and did not have any logical carryover to Kyte's letters." 227 *N.J.Super.* at 92.

Although our review of the record suggests that the Appellate Division's conclusions about motivation are correct, the question of motivation necessarily concerns abuse of privilege and is an issue normally reserved for the jury. *See Barbetta Agency v. Evening News Publishing Co.*, 135 *N.J.Super.* 214, 218 (App.Div.1975). A jury could conclude under Erickson's theory that the sexual-harassment charges were fabricated to dismiss him that Kyte's letters concerning Erickson's qualification were false and made with a malicious intent. Although that theory does not establish a cognizable claim under LAD, it could possibly support Erickson's libel claim. Thus, we reject the Appellate Division findings with respect to malice.

The jury in this case determined that Kyte's statements were malicious only by a preponderance of the evidence. As discussed above, however, on remand in order to overcome

Kyte's qualified privilege, Erickson must prove malice on her part by clear and convincing evidence. We thus remand Erickson's libel claim for a new proceeding employing the appropriate burden of proof.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded to the Superior Court, Law Division, for further proceedings in accordance with this opinion.

*For affirmance in part, reversal in part and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.