784 A.2d 727 (2001)
345 N.J.Super 194
Lois Ann OAKLEY, Plaintiff-Appellant,
v.
David WIANECKI, Ronald Ensana, Thomas Chicino, Clifford Owens, William Fauver, William Plantier, Grace Rogers, George Blaskewicz, and the State of New Jersey, Department of Corrections, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted September 17, 2001.
Decided November 16, 2001.
*728 Mandy R. Steele, attorney for appellant.
John J. Farmer, Jr., Attorney General, attorney for respondents (Patrick DeAlmeida, Deputy Attorney General, of counsel; Barbara Berreski, Deputy Attorney General, on the brief).
Before Judges PRESSLER, WEFING and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
Plaintiff, a former Senior Corrections Officer (SCO) with the New Jersey Department of Corrections (DOC), appeals from a summary judgment dismissing her complaint against the DOC and a number of her superior officers and co-workers alleging violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -30(LAD), as well as common law torts, breach of contract and unlawful acts of retaliation involving her employment. We are satisfied that under the standard set out in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995), plaintiff failed to demonstrate that she could establish any of those claims, and thus we affirm.
Plaintiff, a white female, alleges that she was subjected to "reverse discrimination" and was required to endure a "hostile *729 workplace" because of her race and gender. She bases her claim primarily on a verbal confrontation with another corrections officer, Clifford Owens, an African American male, in which he directed a coarse, insulting and sexually explicit insult at her. Additionally, she claims she was exposed to other hostile incidents over the eleven years of her employment with the DOC and also that the DOC did not properly handle the complaint she lodged against Owens. We find no merit in any of the charges.
Plaintiff began work with the DOC in August 1986, as a Corrections Officer Recruit (COR). As is customary, she remained a COR for one year, after which she became a Senior Corrections Officer (SCO) and then completed a four month probationary period. Thereafter, she worked as a corrections officer-essentially a prison guardand performed duties customary to that position until she retired in January 1997, because of a back and neck injury unrelated to her present claims.
The incident on which plaintiff's complaint centers occurred on September 6, 1994, while she was working at the Adult Diagnostic and Treatment Center (ADTC) operated by the DOC. She was assigned to an area known as the East Sallyport, and was working a shift that began at 7:20 a.m., and ended at 2:20 p.m. Shortly before 2:00 p.m., it became necessary to deliver a set of keys from her area to a Sergeant Runyon who was located in another area of the prison. Corrections Officer Owens was working in an area next to plaintiff and apparently could have delivered the keys to Runyon. For whatever reason, however, Owens did not deliver the keys and as a result, another officer, Terry Lewis, was required to come and obtain the keys. When Lewis arrived, he expressed to plaintiff his annoyance because he had been required to make an unnecessary trip. Plaintiff expressed her general agreement, commiserated with Lewis and made some uncomplimentary remarks about Owens. Owens, who was within earshot of that discussion, apparently became angry at plaintiff's comments, and called out the crude obscenity referred to above.
At or about the time Owens made that comment, plaintiff left her assigned post in East Sallyport and stepped through a doorway and into another prison area in order to obtain the keys that had to be delivered. She acknowledged that in doing so she departed from her obligation not to leave her post, although she claimed she had done so many times in the past without being criticized or disciplined.
The next day, plaintiff filed a complaint with the appropriate superior prison officer complaining of Owens' remark. As a result, Owens was charged with conduct unbecoming an officer. Within a few days thereafter, plaintiff was charged with having left her assigned post and, since Owens and another officer who had witnessed the incident claimed that plaintiff had (at least in part) precipitated the incident by directing profanity at Lewis and calling him "a baby," she too was charged with conduct unbecoming an officer. Both were told they faced a possible five-day suspension as punishment.
Owens then "stipulated" to the charge against him in return for having his proposed punishment reduced to a three-day suspension. On that basis, he was found guilty of the charge and was suspended for three days. Although that same resolution was available to plaintiff, she rejected it and instead proceeded to a hearing on the charges against her. At the hearing, the charge of conduct unbecoming an officer was dropped, but she was found guilty of having left her post. The originally designated five-day suspension was then imposed upon her.
*730 Plaintiff also asserts that she was required to endure a series of hostile and discriminatory comments and actions throughout her employment with the DOC. However, during a lengthy deposition, constant attempts by the attorney representing the DOC to obtain details of those charges and descriptions of the incidents of which plaintiff complained were unsuccessful. In virtually every instance, plaintiff's complaints turned out to be vague, based on rumors or unsupported conclusions that she drew from comments which might well have been innocent or non-discriminatory, and none of her charges added up to the pattern of discrimination and hostility she claimed.
Thus, for example, plaintiff apparently asserted sexual harassment from what seems to have been nothing more than an invitation to go out with a male officer who was not her superior and who, for all that appears, invited her once, accepted her rejection, and never repeated the invitation. As plaintiff described it:
A. When I first started a black officer Johnson Junior asked me to go out. Didn't even ask me to go out. He wanted me to cook for him because he thought I needed some company.
Q. And what did you say?
A. No.
Q. Did anything else happen after that with this officer?
A. No.
Q. There was no repercussion or anything like that is what I'm getting at?
A. No.
With respect to other conduct which plaintiff seemed to characterize as discriminatory, she acknowledged that work assignments were generally based on seniority and her failure to obtain a desired assignment was due to her lack of seniority. In addition, she said a number of times that, early in her work tenure, male officers seemed to have problems with the concept of female corrections officers. However, whenever she was questioned as to how that "trouble" manifested itself, she answered vaguely and almost never with any particularity. She said "some supervisors" had bad attitudes, but she could name no such supervisor nor could she particularize any manifestation of such bad attitudes. She referred to one supervisor who addressed her as "miss," rather than "officer," to which she apparently took offense. However, she did not indicate that the supervisor either intended or understood that his form of address was unacceptable to her (nor did she ever so advise him) and, on another occasion, she summed up her general complaints by saying, "It's not really important. They were just, you know." Subsequently she acknowledged that male attitudes did improve when she "proved to them that I could do the job."
Plaintiff also complained of the manner in which her superiors handled her complaint against Owens and the complaint lodged against her. She took offense at one superior who was eating lunch while plaintiff described the problem. She regarded that action as unprofessional and, apparently, disrespectful, and she also complained that the prison generally-inmates and staff-knew the details of her confrontation with Owens. She believed that Owens had discussed the matter with other corrections officers and inmates, although Owens said nothing directly to her. At other times during her deposition, she acknowledged that in the closed community of a prison, virtually everyone, inmates and staff, inevitably hear of such incidents.

I
Except for her description of the September 6, 1994 confrontation with Owens, *731 plaintiff's claims of discriminatory treatment or a hostile work environment are so vague and lacking in substance as to require dismissal under the standard established in Brill v. Guardian Life Ins. Co. of Am., supra.
In Brill, the Supreme Court said that in deciding a motion for summary judgment, the motion judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party ..., are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, at 523, 666 A.2d 146. Only where the party opposing the motion has presented evidence that creates a "genuine issue as to any material fact challenged" should a court deny a summary judgment motion. Id. at 529, 666 A.2d 146. When "the evidence is so one-sided that one party must prevail as a matter of law ... the trial court should not hesitate to grant summary judgment." Id. at 540, 666 A.2d 146.
Those standards seem almost tailor-made for this case. Except for the Owens confrontation, plaintiff's claims are so nebulous as to defy characterization as raising genuine issues of fact. The examples cited above were replicated constantly during her presentation. Almost without exception, that presentation was devoid of facts and based on unsubstantiated inferences and feelings. Viewing the claims in the light most favorable to plaintiff, but bearing in mind her inability to particularize the claims and present them in anything resembling a detailed, specific and rational manner, whatever evidence exists is so one-sided that plaintiff cannot possibly prevail at a trial. To paraphrase the Court in Brill, "To send [this] case to trial, knowing that a rational jury can reach but one conclusion, is indeed `worthless' and will `serve no useful purpose.'" Id. at 541, 666 A.2d 146.

II
Plaintiff's description of her confrontation with Officer Owens does not suffer from that lack of particularity. It is described in detail. However, it is the only rational basis presented in support of plaintiff's claim, and it falls far short of establishing discrimination, either by itself or as demonstrating a hostile workplace.
Plaintiff's claim is that she suffered discrimination because she was a white woman. While female complaints of discrimination based on gender are not, of course, atypical, see, e.g., Lehmann v. Toys `R' Us, 132 N.J. 587, 626 A.2d 445 (1993), claims of racial discrimination against white persons have been termed "reverse discrimination" claims and are acknowledged to be atypical. Generally, an employee alleging such reverse discrimination is required to show some reason to believe that his employer is the "unusual employer who discriminates against the majority." Erickson v. Marsh & McLennan Co., 117 N.J. 539, 551, 569 A.2d 793 (1990). Plaintiff here claims that as the result of a class action suit instituted by African American employees against the DOC, the DOC has engaged in a practice of favoring black employees and, on that basis, she claims to have met the requirement of Erickson. While that proposition is questionable, and the DOC denies any propensity to disfavor white officers, we shall accept plaintiff's premise for purposes of this opinion since, in any event, and even on that basis, plaintiff has not demonstrated a LAD violation.
In Lehmann v. Toys `R' Us, supra, the Supreme Court set out the elements which must be demonstrated by one claiming a violation of LAD based on a hostile work environment. Paraphrasing that test to reflect plaintiff's claim of reverse discrimination *732 here, one making such a claim must show:
(1) the conduct complained of would not have occurred but for the employee's protected trait (white woman);
(2) the conduct was severe or pervasive enough to make a
(3) reasonable person of the same protected trait believe that
(4) the conditions of employment and the working environment has been altered and the working environment has become hostile or abusive.
In Lehmann, the Court noted the possibility that a single act of discrimination or offensive conduct could, under certain conditions, create a hostile work environment. However, said the Court, "it will be a rare and extreme case in which a single incident will be so severe that it would, from the perspective of a reasonable woman, make the working environment hostile,...." Lehmann, supra, 132 N.J. at 606-07, 626 A.2d 445. And see Taylor v. Metzger, 152 N.J. 490, 501, 706 A.2d 685 (1998), where the Court again noted that while such a case would be rare, "a single utterance of an epithet can, under particular circumstances, create a hostile work environment."
In Taylor, the Court dealt with just such a "single utterance" incidenta particularly ugly racial epithet which the Court found "had an unambiguously demeaning racial message that a rational factfinder could conclude was sufficiently severe to contribute materially to the creation of a hostile work environment." Id. at 502, 706 A.2d 685. The term employed against an African American employee, "jungle bunny," was described by the Court as "patently a racist slur, and is ugly, stark and raw in its opprobrious connotation." Id. at 502-03, 706 A.2d 685. The experience of being called such a name, "is like receiving a slap in the face. The injury is instantaneous." Id. at 503, 706 A.2d 685. In addition, said the Court, the "severity of the remark" in Taylor,
was exacerbated by the fact that it was uttered by a supervisor or superior officer. Defendant was not an ordinary co-worker of plaintiff; he was the Sheriff of Burlington County, the chief executive of the office in which plaintiff worked. That fact greatly magnifies the gravity of the comment.

[Ibid.]
None of those additional factors are present here. While Owens' comment was undoubtedly ugly and offensive, it did not carry the connotation of inferiority inherent in the epithet used in Taylor or any comparable connotation. It was an expression of anger, and was uttered in the context of an angry exchange between plaintiff and Owens, and for all that appears, was not significantly different from what Owens might have aimed at another male or an African American woman in a similar situation.
Nor was Owens in a superior or supervisory position above plaintiff. Instead he held the same rank and position that she held. He did not have the capacity enjoyed by the sheriff in Taylor who, the Court said, "has a unique role in shaping the work environment." Ibid.
We also see no discrimination in the DOC's treatment of either plaintiff or Owens as a result of the September 6, 1994 incident. The DOC acted promptly and firmly in dealing with Owens' unacceptable conduct. Within days it filed formal charges against him for conduct unbecoming an officer and told him he faced a five-day suspension if he were found guilty of the charge. That seems to constitute a reasonable punishment, and we see no basis for an argument that the DOC should have done more. Nor do we see anything wrong with the DOC's agreement to accept what amounted to a "guilty plea" as part of a "plea bargain," bypass the hearing, *733 and impose a three-day suspension. As noted, that same option was available to plaintiff respecting the charges against her.
Nor is there any basis to find that the DOC did not respond fairly and without discrimination in dealing with the complaint against plaintiff herself. She was originally charged with conduct unbecoming an officer and leaving her post. The first charge apparently referred to allegations of her inappropriate comments to Owens, but that charge was dismissed. She was found guilty of leaving her post, but there seems no question that she did commit that violation. Her claim that she committed similar violations in the past without disciplinary consequence is submitted with the same lack of specificity that characterizes most of her charges. The fact that she was disciplined here, in the context of what the DOC authorities might well have concluded was an entire panoply of inappropriate actions by both plaintiff and Owens, does not support a claim of discriminatory action. And, as noted, she was originally exposed to no more than the same discipline as Owens. That the discipline finally imposed was greater than that inflicted on Owens was the result of her decision not to accept the "plea bargain" and to proceed with a hearing and face the consequences. There was no showing of discrimination.
In sum, judging plaintiff's claims by the standard set out in Brill, we are satisfied that the trial court correctly dismissed plaintiff's complaint. Although we agree that a single incident may be sufficient to establish the hostile work environment which plaintiff asserts, we find that the single act relied on here fell far short of having the drastic impact required by the test set out in Lehmann v. Toys `R' Us and Taylor v. Metzger, supra. And we find the remaining allegations of discriminatory acts before and after the Owens incident to be so insubstantial and lacking in detail and substance as to add nothing to her claim.

III
Our disposition of plaintiff's claims under Points I and II, based on their lack of substantive merit, makes it unnecessary for us to discuss at length the remaining issues argued by the parties. Thus, while defendants claim that charges based on incidents before May 1994, are barred by LAD's two year statute of limitations,[1]see Montells v. Haynes, 133 N.J. 282, 627 A.2d 654 (1993), plaintiff argues that those claims are not barred because they were part of an ongoing series of discriminatory actions. However, our conclusion as to the insubstantial nature of plaintiff's allegations (other than those involving Officer Owens) include her allegations pertaining to the period before May 3, 1994, and thus, those complaints fail on their merits, altogether apart from the impact of the statute of limitations.
Similarly, although plaintiff also claims a right to recover for common law tort and breach of contract claims,[2] those claims involve precisely the same allegations discussed above respecting the charges of LAD violations. They have no more substance or merit in the context of claimed breaches of plaintiff's asserted employment *734 contract, or the torts of intentional infliction of emotional distress and/or outrageous conduct, then they have when presented as allegations of LAD violations. No matter how characterized and which pigeon hole they inhabit, they lack merit.

IV
Finally, we note plaintiff's claim that defendant failed to provide required discovery. Plaintiff refers to her request that defendants submit details concerning other complaints of discrimination which, plaintiff claims, have been filed respecting actions of the DOC and its personnel. Defendants had responded to those demands by providing information as to certain complaints and then certifying that, "there are no reports of sexual harassment other than those already provided." Based on that certification, the trial court denied plaintiff's motion to strike defendants' answer which was premised on a claim that defendants' certification was false. The court found no basis for reaching that conclusion, nor do we.
Plaintiff maintains that her counsel has personal knowledge of such complaints from eleven named individuals. As noted, defendants deny the existence of such complaints, but point out that sometimes oral reports or observations are referred to as "complaints," and they do not deny that there may be such "complaints" of which they have no record.
If indeed plaintiff or her counsel have records of such additional complaints, and if the existence of those complaints was in some way relevant to any of the issues of this case, then the reasonable course for plaintiff would have been to submit that information in some approved wayby presenting copies of documents, certifications from the persons involved, or whatever other approach might have been possible. To ask the trial court to simply conclude that defendants and their counsel are not telling the truthwhen there is no basis to reach that conclusionwould be totally unjustified. We find no merit in the claim of error respecting discovery.
Affirmed.
NOTES
[1] Before plaintiff filed the present case, she commenced suit in the United States District Court on May 3, 1996, raising many of the same issues she raises here. The federal claims involved in that suit were dismissed by summary judgment, and the remaining claims were dismissed for lack of subject matter jurisdiction. The defendants argue that the statute of limitations bar is effective as of two years before filing of the federal suit, that is, May 3, 1994.
[2] Plaintiff's complaint includes counts for intentional infliction of emotional distress and outrageous conduct, as well as the alleged breach of an employment contract which plaintiff infers from the DOC's employee manual and employment policies. She also alleges that the DOC retaliated against her for her actions respecting Officer Owens, and that retaliation constitutes a further violation of LAD. In addition to the defenses it raises against all of plaintiff's other claims, the DOC maintains that plaintiff's tort and contract claims are barred by her failure to give the notice required by the Tort Claims Act, N.J.S.A. 59:8-8 and -9, and the Contractual Liability Act, N.J.S.A. 59:13-1 to -10. The trial court agreed that plaintiff's failure to provide statutory notice under the Tort Claims Act barred those claims but did not address the notice issue respecting the breach of contract claim. For the reasons set out above, we do not find it necessary to address either of those issues in this opinion.