**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4313-17T3

KC DYER,

     Plaintiff-Appellant,

v.

NEW JERSEY TURNPIKE
AUTHORITY and THOMAS
MCGRATH,

     Defendants-Respondents.

_____

> Argued telephonically March 24, 2020 –
> Decided July 24, 2020
>
> Before Judges Rothstadt, Moynihan and Mitterhoff.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-1273-14.
>
> Richard Armen Mc Omber argued the cause for appellant (McOmber & McOmber, PC, attorneys; Richard Armen Mc Omber, Matthew Allen Luber, and Elizabeth A. Matecki, of counsel and on the briefs).
>
> Thomas Christoph Bigosinski argued the cause for respondent New Jersey Turnpike Authority (McElroy, Deutsch, Mulvaney, & Carpenter, LLP, attorneys;

Thomas Christoph Bigosinski, of counsel and on the brief).

Robyn Beth Gigl argued the cause for respondent Thomas McGrath (GluckWalrath LLP, attorneys; Robyn Beth Gigl, of counsel and on the brief; Fay L. Szakal, on the brief).

PER CURIAM

In this employment discrimination matter, plaintiff KC Dyer appeals from an April 24, 2018 order granting summary judgment in favor of defendants New Jersey Turnpike Authority (NJTA) and Thomas McGrath and dismissing with prejudice plaintiff's claims of hostile work environment sexual harassment and retaliation, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, and intentional infliction of emotional distress (IIED). Plaintiff's allegations centered on her discomfort arising from her supervisor McGrath's behavior toward her for several years, beginning in 2004.

In dismissing plaintiff's LAD claims, Judge Vincent Le Blon determined that certain of plaintiff's claims were barred by the two-year statute of limitations, but regardless, the periodic friction between plaintiff and McGrath was not severe or pervasive enough to alter the conditions of plaintiff's employment. The judge further concluded that plaintiff failed to identify acts of retaliation and failed to make a prima facie showing of IIED. On appeal,

plaintiff contends that the judge erred in dismissing each of her claims.  Finding no merit in these arguments, we affirm.

I.

A.

We discern the following facts from the record, viewing them in the light most favorable to plaintiff.  See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).  In 2002, plaintiff began working as a data clerk in the finance department of the New Jersey Highway Authority and reported to Stellanie Callanan.  In 2004, the New Jersey Highway Authority merged with the NJTA.  During the same year, plaintiff was promoted to the position of data analyst, which involved auditing toll collectors and completing some clerical work, and she began reporting to McGrath, the Audit Operations Supervisor, and three supervisors under McGrath:  Laurie Iko, Joanne Jackson, and Lynette Gonier.  McGrath reported to the Financial Manager, Michael Schwartz, and Schwartz reported to the head of the finance department, Donna Manuelli.

In March 2008, plaintiff was invited to interview for a higher paying position in the maintenance department.  She emailed McGrath about the interview and added, "I'd REALLY like to stay within this department but I NEED more money, do you know of anything else coming up that I would

3

qualify for making more money working for this department?" According to plaintiff, she wanted to stay in the department because she "was a team player" and "worked with [her] co[]workers well." Despite her interest in the position, plaintiff stated she did not get the job because it "was already spoken for."

From approximately December 22, 2009 through January 11, 2010, plaintiff took a short leave of absence, after her physician certified to diagnoses of anxiety, panic attacks, and insomnia.

In August 2011, another position in the maintenance department became available, but plaintiff declined. Later that month, plaintiff emailed Schwartz and McGrath, expressing her interest in a promotion they had recently discussed. She wrote, "I know I'm happy here☺ I'd love to stay and grow with the finance department." Two months later, Schwartz wrote to Manuelli about an audit data specialist position. He and McGrath recommended plaintiff for the position, from among two other internal candidates, because plaintiff "ha[d] proven herself as a valued employee," and she had "proficient computer skills and . . . superior work histories." At the end of November, Manuelli awarded plaintiff the promotion.

In her new position, plaintiff continued to work under McGrath until she took a medical leave of absence in May 2013. She returned to NJTA in October

of that year, and she has continued working in the same position, although upon her return, her seat was moved to a different floor, and she was instructed to report to Callanan instead of McGrath. Plaintiff was advised that McGrath had been instructed not to communicate with her, and McGrath honored that instruction. McGrath has since retired from NJTA.

B.

NJTA's "Equal Employment Opportunity and Non-Discrimination Harassment/Retaliation Policy," effective November 2, 2004, expressly prohibits discrimination "against any individual in compensation or in terms, conditions or privileges of employment based upon sex" or seventeen other attributes. NJTA expects all employees "to accept these principles and to reflect their spirit in everyday relationships with fellow staff members." It further declares that all NJTA employees "have the right to be free from sexual harassment . . . [and] inappropriate conduct and communications." The policy incorporates NJTA's "Sexual Harassment" policy, effective January 11, 1993 and revised in March 2004, which defines sexual harassment and provides specific examples of prohibited conduct. Any employee subjected to harassment or discrimination in violation of these policies, or witnessing such an

5

occurrence, is directed to report the incident in accordance with the procedures outlined in the policies.

According to Mary Elizabeth Garrity, NJTA's Director of Human Resources, these policies are provided to all employees, and all employees must attend anti-harassment training sessions every two years to address diversity awareness and the prevention of discrimination, harassment, and retaliation. Plaintiff does not dispute that she received copies of the policies or that she has participated in required trainings.

C.

From 2005 through 2011, Schwartz issued several directives to department employees regarding personal and social interactions during work hours. In November 2005, he issued a memorandum to reinforce the rules prohibiting "personal conversations and gatherings at another employee's desk" to avoid disturbing coworkers and requiring employees to inform their supervisor if they needed to leave their desks for an extended period. This directive was prompted by "several complaints regarding excessive personal conversations and extended breaks." These problems were not permanently corrected, so Schwartz issued a similar memorandum in July 2007.

A-4313-17T3

In November 2009, Schwartz distributed another memorandum, implementing several new rules: All employees were required to take their fifteen-minute morning and afternoon breaks at the same time and their one-hour lunch break at one of two designated times; all in-office celebrations could occur only during a break or lunch hour; and at all other times, employees were not permitted to talk with friends or family.

In August 2011, Schwartz issued yet another memorandum prohibiting employees from allowing employees from other sections to be present in their workspaces, unless the interaction was work-related.

Plaintiff did not question Schwartz's authority to regulate such matters within her department. During these time frames, employees from other departments would sometimes stop by plaintiff's cubicle to socialize, and McGrath would complain about it, as it could be disruptive. However, according to plaintiff, around the November 2005, July 2007, and November 2009 time frames, McGrath would also "hang out" at her cubicle for an "excessive amount of time." In addition to making plaintiff uncomfortable, it upset her coworkers because they were not permitted to have visitors at their cubicles. Plaintiff did not recall anyone other than her friend from a different department, Genia McCue, visiting around the August 2011 time frame.

A-4313-17T3

D.

Plaintiff and McGrath's work relationship lasted around nine years. We have summarized their interactions that are most pertinent to plaintiff's claims.

On May 30, 2006, plaintiff emailed McGrath that she was running late to work because of traffic. McGrath responded with the words "bad, bad girl." Plaintiff stated this was not the end of the conversation, and she replied with "yeah, I know," to which McGrath responded, "I thought you were pure." Plaintiff replied, "I am," and McGrath wrote, "I think you deserve a spanking." Plaintiff asserted that she did not preserve this part of the exchange because the conversation made her panic, so she deleted the worst parts.

Plaintiff's first formal complaint about McGrath occurred in April 2007, after an incident at a department-organized baby shower for a coworker. According to plaintiff, her supervisor Jackson had asked her to help set up for the baby shower, so plaintiff obliged. McGrath entered the conference room, asked plaintiff why she was there without permission, and told her she needed his permission to be there. Plaintiff felt embarrassed, as it occurred in front of several coworkers. According to Kimberly Snyder Mohr and Sheri Ann

Czajkowski, union shop stewards[1] to whom plaintiff reported the incident, McGrath "tapped her on the shoulder" before questioning her. However, plaintiff later stated that McGrath had "pushed" her and then pointed his finger in her face. This was the only incident involving physical contact between plaintiff and McGrath, and plaintiff stated that it was not in a sexual manner.

After the incident, plaintiff met with Schwartz, McGrath, Snyder Mohr, and Czajkowski for about twenty minutes. Plaintiff told McGrath that he made her uncomfortable because he was "smothering" her and made inappropriate comments, although she did not elaborate except to say that he would watch everything she did and closely scrutinize her performance. She added that his behavior caused her to believe that he disliked her. After hearing plaintiff's concerns, McGrath apologized and said that he was unaware he made plaintiff feel uncomfortable, so he agreed to stay away from her. Plaintiff felt the tone of the meeting was cordial and believed it would resolve her concerns about McGrath, so she accepted his apology.

Plaintiff stated she did not report any sexual or otherwise inappropriate comments at the 2007 meeting because it made her uncomfortable to say such

---

[1] Throughout plaintiff's employment, she has been a member of Local 97.

A-4313-17T3

things, but she "was hoping" Schwartz would have asked about it. Plaintiff recalled that before 2007, McGrath once complimented her pedicure and told her she should get his face painted on her nails. Plaintiff inferred that by saying that, he meant he wanted to look up her dress. She responded, "[W]hy would I get an old man's face painted on my toes?" According to plaintiff, because of this conversation, her coworkers "retaliated" against her by not speaking to her for six months. In addition to this incident causing plaintiff to feel uncomfortable, she recalled McGrath complimenting her outfit several times a week around the same time.

According to plaintiff, McGrath left her alone for a while after the meeting, but about six months later, he started to "hang around [her] cubicle again" and complained when other employees visited plaintiff.

Although plaintiff claimed that McGrath's constant presence made her uncomfortable, she admitted to inviting him to her cubicle on various occasions for non-work-related purposes and voluntarily discussing personal matters with him. She stated that she even considered him a "friend" at times. Sometimes she would ask him for favors, which he granted, including her request for her to go on a trip to Dunkin' Donuts during work hours and requests to adjust her work schedule. She further stated that McGrath would also decline to reprimand her

at times when she arrived late to work. In response to these "favors" for letting her take off time from work, she once brought him a signed baseball from a Yankees game.

During 2008 and early 2009, plaintiff and McGrath exchanged certain emails, which plaintiff now asserts are evidence of his harassment. On June 18, 2018, plaintiff emailed McGrath to ask if she could only put in for half a day because her ride to work, McCue, needed to leave early that day. McGrath said it was not a problem and added, "Tell G she owes ME."

On September 17, 2008, plaintiff emailed McGrath to ask if she could take a short lunch and leave early to attend a dentist appointment. McGrath told her he would think about it and then responded a few minutes later, "[L]et's see, are you coming to the picnic, the [C]hristmas party?" Plaintiff responded, "Def the Christmas party!!!! I have to see on the picnic," and then explained why she might not be able to attend the picnic. The conversation ended after McGrath wrote, "[W]e won[']t be seeing you then, but the lunch thing is ok, I told [Iko]." Plaintiff stated that on four occasions, McGrath conditioned his approval of her request for personal time on her attending his picnics.

On December 12, 2008, plaintiff asked McGrath if she could leave early because she was not feeling well. McGrath responded, "[Y]ou will owe." When

11

plaintiff replied with "?," McGrath explained, "[I]f you leave, you have no time right? [Y]ou will have to make it up."

On February 12, 2009, McGrath emailed plaintiff, "I didn't say it, but you look nice." Plaintiff responded, "Awe, Thank you!!!" Finally, five days later, McGrath emailed plaintiff, "[A]re you being shy? [T]rying to tell me something?" Plaintiff replied, "Ha. You wish that was it!!!!!!! LOL."

In April 2009, McGrath sent plaintiff a Facebook message that read, "You are 'Dirty Thirty' this week, make sure you enjoy yourself."

On December 7, 2009, plaintiff emailed McGrath in response to his department email offering to treat the employees for the holiday season. She thanked him for the offer and also asked if she could move to Gonier's old seat because she "like[d] being alone" and was "hearing way to[o] much gossip." McGrath replied that she could not have the seat, as it had already been assigned to someone else. Plaintiff stated that the gossip to which she was referring was caused by her coworkers' resentment of the way McGrath treated her.

On December 10, 2009, plaintiff emailed Czajkowski about "a major problem" with McGrath that occurred while plaintiff was telling a coworker she was "aggravated" she could not use the Internet at work to check her bank account. McGrath overheard and told plaintiff she would never have that access.

12

The conversation turned into a screaming match, and according to plaintiff, McGrath insinuated that non-managerial employees were less responsible than him and that if plaintiff did not like the policy she should leave. Plaintiff added that after their argument, McGrath emailed everyone whom he supervised, instructing them to be on time to work. Plaintiff explained that this upset her because McGrath would let it slide when she arrived late.

Czajkowski replied, explaining that McGrath's explanation of the Internet access policy was correct, including his view that it would not change, but she offered to speak with McGrath about his tone. She added that plaintiff was taking risks by frequently arriving late, "since other people in [the] department are scrutinized for their time minute by minute" and could complain about McGrath giving plaintiff preferential treatment.

Within days of the argument, plaintiff met with Manuelli and Czajkowski to discuss McGrath. Plaintiff complained that McGrath spent too much time at her cubicle and stated that she did not want to be friends with him. She also testified that she showed Manuelli several emails revealing McGrath's inappropriate behavior. According to plaintiff, this prompted Manuelli to tear up the notice of subordination Schwartz had drafted about plaintiff's behavior toward McGrath during their argument over the Internet policy. She also

testified that Manuelli assured her, "[M]y door is always open if you want to come in and talk to me and I'll make sure he stays away from you," and "if you need to move we can move you." In response to plaintiff's comments, Manuelli met with McGrath and Schwartz and instructed McGrath to limit his interactions with plaintiff to work-related conversations and office pleasantries.

For almost a year, McGrath stayed away from plaintiff. Then, in December 2010, Human Resources sent all employees a memorandum announcing the death of plaintiff's father, so McGrath and several other coworkers attended the wake, which was open to the public. According to plaintiff, after the wake, "[McGrath] started coming around more."

E.

During the spring of 2013, a series of events occurred, which prompted plaintiff to file an Equal Employment Opportunity (EEO) complaint with NJTA. In her June 24, 2013 complaint, plaintiff expressed that she "was being smothered by [McGrath's] constant attention." He visited plaintiff at her cubicle several times daily but would not interact with other employees in this way, and he would tell her that her coworkers disliked her. After plaintiff told him to stop saying such things, he stopped but continued to visit her cubicle regularly.

According to plaintiff, during the week of April 15, 2013, she was covering for two coworkers, so when McGrath stopped by her cubicle, she told him she did not have time to talk. According to plaintiff, McGrath "became frantic" and said, "What is it, what do you need help with. I will help you; I will help you do anything." When plaintiff declined the offer, he replied, "I'll help you with anything because I like you." Plaintiff claimed she had to turn her chair away to get him to leave her alone. She explained that she had initially declined to report this incident, as well as others, because she "hoped . . . McGrath would stop on his own after repeated hints."

Then, in May 2013, plaintiff asked Schwartz for a week of vacation. She assumed that McGrath had reported her recent complaints to Schwartz, when Schwartz told her, "[W]hen we gave [you] this position we thought you could handle it, you have to grow a thicker skin." Plaintiff responded that McGrath "acts like he owns me and he doesn't leave my desk." Schwartz suggested that she talk to McGrath, and she said that she had done so to no avail, she did "not want to make waves," and she just wanted to "take the week to work through this." Schwartz ultimately allowed plaintiff to take the week off.

When plaintiff returned to work, McGrath instructed her to open bags of mail for the toll collectors, which she proceeded to do for three days. He also

yelled at her one day after her friend from the engineering department had visited her during the last ten minutes of the previous workday. McGrath told her that someone complained about it, and then he said, "[W]ould you just listen to me . . . I am trying to be your fucking friend!"

Later in the week, plaintiff saw that "mail was thrown all over [her] desk," so she went to speak with Iko, and said, "I guess I am opening mail again today." Iko informed plaintiff that Schwartz had ordered the finance department employees to assist with opening the bags. According to the complaint, plaintiff "had a full blown panic attack and ran downstairs to human resources." She spoke with Garrity, who told her that McGrath was told he was not allowed to speak with her anymore. Plaintiff responded, "That explained . . . why he was doing my work and leaving me no work to do." Garrity testified that this was the first time she became aware of plaintiff's concerns about McGrath's behavior.

Plaintiff summarized her complaints as her having dealt with, for nine years, McGrath "acting like he ha[d] ownership over [her]," and refusing to stop, despite repeated requests. To illustrate the continuity of McGrath's inappropriate behavior, plaintiff attached copies of several e-mails she felt were inappropriate, dated from May 30, 2006 to September 4, 2009. Plaintiff stated

that she declined to mention anything of a sexual nature because she "didn't want to get [McGrath] in trouble" and "just wanted to be moved away from him."

Although not discussed in the EEO complaint, after these incidents, plaintiff visited NJTA's medical department in tears and explained that her supervisor had been harassing her for weeks, and after having taken a leave of absence for a week, she returned to the office with "a lot of work on her desk," causing her to feel "overwhelmed and frustrated." Noting that plaintiff had previously been treated for stress anxiety and panic disorder, NJTA's physician excused her from work. Plaintiff's personal physician agreed and informed Garrity that when plaintiff returned to work she would "need a different placement . . . to accommodate her medical issues." Thereafter, plaintiff was approved for temporary disability.[2]

Noreen Daniels, NJTA's EEO officer, investigated plaintiff's complaint with the assistance of NJTA's in-house attorney, Mark Schneider. Daniels

---

[2] When she presented for a medical evaluation at NJTA's medical department on June 14, 2013, the doctor informed her she was ineligible for temporary disability benefits because her medical leave was connected to the workplace. Four days later, Garrity emailed plaintiff and advised her that she needed to fill out the workers' compensation paperwork and that NJTA would be processing her temporary disability papers. The following day, she was approved for temporary disability, retroactive to May 31, 2013.

17

interviewed plaintiff and McGrath separately during July 2013, and Schneider took notes during both interviews.

According to the interview notes, plaintiff felt that McGrath was "smothering" and isolating her. She complained that McGrath was "creepy" and his inappropriate behavior began around 2004. She also complained that he started "hanging around her cubicle all day" in 2007. Throughout the years, McGrath would make inappropriate comments. For example, he asked if plaintiff was wearing lipstick, instructed other employees not to speak with plaintiff or go near her, sent plaintiff emails saying she owed him if she wanted to take time off, and constantly talked about his ex-girlfriend after they ended their relationship. He also left CDs of love songs at plaintiff's desk and once visited a bar down the street from plaintiff's home. In addition, he would not give plaintiff any work but then "inundated her" with mail to open. Plaintiff did not identify any physical contact between her and McGrath, other than claiming that he "pushed" her during their interaction before the baby shower. Plaintiff explained that she reported McGrath's behavior to three supervisors, and on one occasion when she complained to Schwartz, he told her she needed to "grow a thicker skin." According to plaintiff, she did not recall much from this meeting,

A-4313-17T3

other than that she remembered mentioning that she told Daniels that McGrath would make comments about a coworker's breasts.

During McGrath's interview, he did not express any major problems with plaintiff. According to him, plaintiff was a good worker and even asked for extra work. He never had to write her up or speak to her about poor performance. Overall, he found her "very pleasant[] but very sensitive [and] a little paranoid." In response to plaintiff's complaint that he had "banned" a male employee from her cubicle, he explained that the employee "was banned from everywhere" because he was not part of their department. He denied that asking plaintiff to open the mailbags was punishment, as everyone was required to do so at times, and he denied taking assignments away from her. He added that he had no romantic feelings for plaintiff and never asked her on a date. If he ever told her she owed him for something, he meant in terms of work, and he denied any quid pro quo and ever asking plaintiff if she was wearing lipstick. He had never had any physical contact with plaintiff, other than before the baby shower incident, when he recalled tapping her on the shoulder to get her attention.

After Daniels and Schneider reviewed the interview notes and documents plaintiff and McGrath provided, Daniels found she was unable to conclude there had been a violation of NJTA's policy against discrimination and sexual

19

harassment. On August 1, 2013, Daniels and Schneider met with McGrath to discuss their findings and instructed him not to retaliate against plaintiff and to avoid spending time at plaintiff's cubicle. Daniels sent plaintiff a letter the same day, advising her of the outcome of the investigation.

On September 20, 2013, plaintiff emailed Garrity, claiming Daniels' investigation was inadequate. She asserted that "[McGrath] was directly instructed twice in the past not to come near [her] and yet he completely disregarded those instructions, kept harassing [her], and spent hours a day sometimes in [her] cubicle." Further, "[he had] blatantly retaliated against [her] for making complaints," engaged in inappropriate conversation by speaking about sexual activities, and isolated her from coworkers. While his conduct "appear[ed] to be 'favoritism,' [it was] actually hostile and suffocating." The failure to propose anything more than a vague "change in reporting structure" prompted plaintiff to engage legal counsel.

On October 2, 2013, Daniels wrote to plaintiff and stated that plaintiff had not previously made allegations of retaliation or sexual comments. She requested that plaintiff meet with her to prepare a written complaint, but plaintiff did not follow up.

A-4313-17T3

## F.

On March 5, 2014, plaintiff filed a complaint against NJTA and McGrath in the Law Division, alleging hostile work environment sexual harassment, retaliation, and IIED. Plaintiff alleged that since 2004, she had been "subjected to repeated, pervasive, severe, and continuing instances of sexual harassment by . . . McGrath on an almost daily basis." Specifically, McGrath would be at her cubicle three to five hours daily, and he would flirt with her, stare at her body, make inappropriate comments about her body and clothing, and discuss inappropriate and sexually explicit topics. He also "direct[ed] [p]laintiff to listen to certain 'love songs'" and made her listen to a raunchy comedian. In addition, he "tried to use his supervisory authority to compel [p]laintiff to go on a date with him" and granted plaintiff's requests for days off from work as a favor, which he stated she would need to repay. Plaintiff claimed that "[b]ecause of his obsession with her, . . . McGrath singled [her] out by attempting to isolate her from her coworkers." He would tell her that coworkers disliked her, and he forbid her from having visitors at her cubicle. He also "made special rules and prohibitions that applied only to [p]laintiff." For example, according to plaintiff, she was the only employee in the department that was required to obtain

McGrath's permission to attend the baby shower, and when McGrath reprimanded plaintiff at the shower, he "angrily pushed" her.

Plaintiff first formally reported McGrath's behavior in 2007 and explained at a subsequent meeting that she felt McGrath was "smothering her." She alleged that NJTA failed to adequately investigate her complaint and implement a remedial plan and denied her request to report to a different supervisor. Plaintiff complained about McGrath again in 2009, after he "wrongfully humiliated [her] in front of another male employee, in an apparent fit of jealousy." According to plaintiff, Schwartz responded by suggesting that plaintiff be written up, and when she asked Schwartz for a day off to think about how to handle McGrath's continued harassment, he told plaintiff she "need[ed] to have thicker skin." Around the same time, plaintiff also reported to Manuelli that McGrath was "smothering [her] and singling [her] out," so she again requested to report to another supervisor. Again, she alleged that her complaint was "wholly unaddressed."

Plaintiff alleged that McGrath's harassment and inappropriate conduct continued thereafter. During the summer of 2012, "McGrath exhibited stalking behavior" by visiting a bar near plaintiff's house "in order to find her" and "instruct[ing] [a] coworker to tell him where [p]laintiff lived and further

instruct[ing] the coworker to drive by [p]laintiff's house." Other employees also noticed McGrath's behavior and would tell plaintiff that they observed him "circle [her] cubicle constantly." Plaintiff filed her third complaint in 2013, but the EEO officer failed to conduct a proper investigation. Plaintiff alleged that all of her complaints were "mischaracterized as a personal disagreement."

To support her claims of retaliation and IIED, plaintiff largely relied on the allegations used to support her hostile work environment claim. With respect to the retaliation claim, plaintiff added that "[a]fter each such complaint, . . . McGrath would scrutinize [her], harass her further, and attempt to isolate her from her coworkers," and he once assigned her the menial task of opening mail as punishment for reporting him.

In response to plaintiff's complaint, Daniels interviewed McGrath, Manuelli, Schwartz, Iko, three union representatives, and six other employees during March and April 2014. Based on these interviews, Daniels issued a detailed final investigative report on December 22, 2014, addressing each of plaintiff's allegations. Daniels concluded that there was insufficient evidence to support most of them and that McGrath's behavior toward plaintiff did not violate NJTA's "Sexual Harassment" policy.

Daniels was only able to identify a few supportable allegations. There was evidence that McGrath spent a lot of time at plaintiff's cubicle, although not three to five hours daily. McGrath once emailed plaintiff the words "bad, bad, girl," but it was a response to plaintiff informing him that she would arrive late to work. He also gave plaintiff an explicit Jimmy Fallon comedy CD and asserted he gave it to her after a conversation about Fallon. However, there was insufficient evidence that McGrath "directed" plaintiff to listen to it. In addition to McGrath's behavior, Daniels found that Schwartz told plaintiff that she needed a thicker skin, but he had made the comment in response to her complaints about coworker gossip regarding plaintiff's promotion.

When plaintiff was deposed, she made additional specific allegations about certain behaviors she felt were inappropriate. She recalled that on one occasion, McGrath told her about his wife's personal problems stemming from her difficult childhood; on another occasion, he told her his sister was sleeping with an older married man; on two occasions, he told her a story about a toll collector that once collected a ticket with semen on it; and on another occasion, he told a story about being on a date and receiving oral sex. Plaintiff was unable to recall the dates of these conversations. She also stated that McGrath gave her inappropriate CDs on two occasions, although she could not recall when. One

CD was an Eric Clapton album, and she claimed he directed her to listen to one of the love songs because it reminded him of her. The other was a raunchy Jimmy Fallon comedy CD. Further, after attending a coworker's wedding, plaintiff claimed that McGrath sent around a picture of plaintiff leaning close to another coworker and stated that it looked like the coworker was touching plaintiff's butt. In addition to these specific allegations, plaintiff insisted that McGrath was "sitting on [her] desk for hours on end every single day," staring at her, and often commenting about a coworker's breasts.

G.

NJTA and McGrath both moved for summary judgment. Judge LeBlon heard oral argument on March 29, 2018, and on April 24, 2018, he issued an oral decision, granting both motions.

The judge found that plaintiff alleged two discrete acts in violation of the LAD—NJTA's failures to reassign plaintiff to a new supervisor in response to her 2007 and 2009 complaints—but these acts occurred outside the LAD's two-year statute of limitations. The continuing violation theory could not save plaintiff's claims, as any additional allegations occurred outside of the two-year window before the filing date of March 5, 2014. Giving plaintiff the benefit of all reasonable inferences, the judge further concluded that plaintiff's allegations

"simply do not show any hostile work related conduct by . . . McGrath after 2009." Additionally, he found that plaintiff failed to allege "conduct [that] was not unwelcome and/or severe and pervasive."

In addition, the judge determined that McGrath could not be held personally liable for a LAD violation because LAD allows redress from employers, and the definition of an employer does not include individual supervisors. The only way McGrath could be held individually liable was if he or aided and abetted in discriminatory conduct. Plaintiff alleged that McGrath was the sole harasser; he could not aid and abet himself.

Under plaintiff's retaliation claim, the judge found that most of the conduct she identified also formed the basis for her harassment claim. The judge explained that "the same conduct that forms the basis of the hostile work place cannot be then used to allege[] retaliation." Moreover, plaintiff did not allege or demonstrate any adverse employment decision. The only conduct relevant to this element was plaintiff's assignment to open the toll collector bags. However, Iko, not McGrath, required plaintiff to complete the task.

Lastly, the judge dismissed plaintiff's IIED claim, as she failed to make a prima facie showing that McGrath engaged in IIED, and he denied plaintiff's

request for punitive damages, "based upon the lack of facts or law to support such a [request]."

This appeal ensued.

## II.

## A.

We review a decision granting summary judgment applying the same standard that governed the trial judge. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). The judge must determine whether, "if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). If so, the motion must be denied. Brill, 142 N.J. at 540. However, "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law," the motion must be granted. R. 4:46-2(c). In the absence of a genuine issue of material fact, we review the judge's application of the law de novo. Henry, 204 N.J. at 330.

27

When reviewing LAD claims, we also consider the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973), and adopted by our Supreme Court, <u>Battaglia v. United Parcel Serv., Inc.</u>, 214 N.J. 518, 546 (2013); <u>Andersen v. Exxon Co., U.S.A.</u>, 89 N.J. 483, 492-93 (1982).  Under this framework,

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [<u>Henry</u>, 204 N.J. at 331 (quoting <u>Dixon v. Rutgers</u>, 110 N.J. 432, 442 (1988)).]

See <u>McDonnell Douglas</u>, 411 U.S. at 802, 804.

B.

We first address plaintiff's hostile work environment sexual harassment claim.  At the outset, we agree with the trial judge that plaintiff alleged discrete acts occurring earlier than March 5, 2012 and that her claims arising from such conduct are time-barred, as LAD claims are governed by a two-year statute of limitations.  See <u>Montells v. Haynes</u>, 133 N.J. 282, 292 (1993).  Additionally, any allegations of conduct occurring within the statute of limitations did not reveal a pattern of tortious conduct sufficient to warrant application of the

continuing violation doctrine. See Mancini v. Township of Teaneck, 349 N.J. Super. 527, 557 (App. Div. 2002), aff'd as modified, 179 N.J. 425 (2004). We further conclude, for the reasons set forth below, that plaintiff did not allege any actionable conduct that occurred within the statute of limitations.

The LAD prohibits employers from discriminating against their employees on the basis of sex or gender. N.J.S.A. 10:5-12(a). This type of discrimination includes sexual harassment, which may arise in the form of a hostile work environment. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 601 (1993). "Hostile work environment sexual harassment . . . occurs when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile." Ibid. It need not be the result of conduct that is sexual in nature and may "occur[] because of the victim's sex." Id. at 602.

To establish a prima facie case for hostile work environment sexual harassment, the employee must demonstrate that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable [person] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Griffin v. City of East Orange, 225 N.J. 400, 413-14 (2016) (quoting

29

Lehmann, 132 N.J. at 603-04). The first prong is discrete, whereas the others are largely interdependent. Lehmann, 132 N.J. at 604.

"Severe or pervasive" conduct may be established by proof of "numerous incidents that, if considered individually, would be insufficiently severe to state a claim, but considered together are sufficiently pervasive to make the work environment intimidating or hostile." Id. at 607. The focus of this cause of action is on the conduct, not the harm an employee may or may not have suffered, as the LAD's "primary purpose is to end discrimination." Id. at 610. Further, "the plaintiff need not personally have been the target of each or any instance of offensive or harassing conduct," as "[a] women's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers." Id. at 611.

Courts apply an objective standard when determining whether a plaintiff has demonstrated harassment that was "sufficiently severe or pervasive to alter the conditions of employment and to create a hostile or intimidating work environment." Id. at 611-12. This objective standard is gender-specific and takes into consideration the reaction of a reasonable person of the plaintiff's gender, who may be either "sensitive" or "tough," and it does not reject a reaction merely because it is emotional. Id. at 613-14. "Only an idiosyncratic

response of a hypersensitive plaintiff to conduct that a reasonable [person] would not find harassing is excluded[.]" Id. at 614. The judge should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Cutler v. Dorn, 196 N.J. 419, 432 (2008) (quoting Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003)).

"[A] hostile work environment discrimination claim cannot be established by . . . comments which are 'merely offensive.'" Mandel v. UBS/Painewebber, Inc., 373 N.J. Super. 55, 73 (App. Div. 2004) (first alteration in original) (quoting Heitzman v. Monmouth County, 321 N.J. Super. 133, 147 (App. Div. 1999)). Employees are "not entitled to a perfect workplace, free of annoyances and colleagues [they find] disagreeable." Herman v. Coastal Corp., 348 N.J. Super. 1, 23 (App. Div. 2002) (quoting Lynch v. New Deal Delivery Serv. Inc., 974 F. Supp. 441, 452 (D.N.J. 1997)). Therefore, not all persistent efforts at friendship are necessarily harassment, when viewed objectively. See Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197-99 (2008).

We reject plaintiff's contention that she showed by a preponderance of the evidence that McGrath engaged in severe or pervasive conduct that would cause

a reasonable woman to believe she was subjected to a hostile or abusive work environment, such that her conditions of employment were altered. Setting aside plaintiff's subjective response to McGrath's alleged behavior, the evidence suggests a largely benign relationship between plaintiff and McGrath, interspersed with a few apparently unprofessional comments over the course of several years, though not rising to the severity or pervasiveness required to create a hostile work environment.

We further reject plaintiff's contention that the record presents genuine issues of material fact as without merit. Several of the purported factual disputes cited in her appellate brief significantly mischaracterize the deposition testimony to which she cites. Additionally, many of her allegations are self-serving conclusory statements based largely on unsubstantiated inferences and feelings, including that McGrath wanted to look up her dress, intended to exchange sexual favors or social interactions for allowing plaintiff to take vacation time, and intended to isolate her and create friction between her and other coworkers. Such assertions are insufficient to defeat a motion for summary judgment. See Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012); Oakley v. Wianecki, 345 N.J. Super. 194, 201 (App. Div. 2001).

C.

We next address plaintiff's retaliation claim. Under the LAD, it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under [the LAD] . . . or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by [the LAD]." N.J.S.A. 10:5-12(d). To establish a prima facie case for a retaliation claim, a plaintiff must show that "(1) [he or she] engaged in a protected activity known by the employer; (2) thereafter [the] employer unlawfully retaliated against [him or her]; and (3) [the employee's] participation in the protected activity caused the retaliation." Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 125 (2008) (quoting Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995)). Additionally, the plaintiff must show there was a reasonable, good faith basis for the complaint that allegedly caused the employer to retaliate. Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 373 (2007).

We reject plaintiff's contention that she showed by a preponderance of the evidence that McGrath and NJTA retaliated against her for reporting McGrath's behavior. In her appellate brief, plaintiff alleges various acts, including increased scrutiny, making nasty remarks and cursing, forbidding visitors in her

cubicle, relegating her to trivial tasks, inappropriately touching and pushing her, writing her up when she objected to McGrath's tone, and refusing to move her seat when she requested. She also cites to the EEO officer's "sham investigation" and the NJTA's end to her disability benefits and dispute as to her workers' compensation claim. These assertions are unsupported, conclusory, mischaracterized, or insufficient to constitute an adverse employment action caused by plaintiff's complaints about McGrath's conduct.

D.

Finally, we address plaintiff's IIED claim. To establish a claim for IIED, a plaintiff must prove four elements: the "defendant acted intentionally or recklessly," the "conduct was 'extreme and outrageous,'" the conduct proximately caused the plaintiff's emotional distress, and such distress was "so severe that no reasonable [person] could be expected to endure it." Ingraham v. Ortho-McNeil Pharm., 422 N.J. Super. 12, 19-20 (App. Div. 2011) (quoting Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366 (1988)).

A plaintiff must demonstrate conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 21 (quoting Buckley, 111 N.J. at 366). Generally, a plaintiff is able to satisfy

34

this "elevated threshold" only in extreme cases, ibid., and "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery," Griffin v. Tops Appliance City, 337 N.J. Super. 15, 23-24 (App. Div. 2001) (quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1998)) (citing Taylor v. Metzger, 152 N.J. 490, 508-21 (1998)).  In Ingraham, we listed several examples of conduct on both ends of the spectrum.  See 422 N.J. Super. at 21-22.

In light of our decisions with respect to plaintiff's LAD claims, we conclude that plaintiff failed to make a prima facie showing of IIED.  While the infrequent comments referring to sexual content or the tone and language involved in heated arguments may be unprofessional and not received well by all, they do not rise to the level of "atrocious" conduct "utterly intolerable in a civilized community."  Id. at 21 (quoting Buckley, 111 N.J. at 366).  Further, plaintiff's own efforts to engage with McGrath and her reference to him as a friend at times belie her contention that his alleged pattern of abuse and obsessive behavior was so intolerable.

To the extent we have not addressed any of plaintiff's remaining arguments, we conclude that they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4313-17T3