**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1745-22

KIMBERLY A. ZACK,

     Plaintiff-Appellant,

v.

INTEGRA LIFESCIENCES
CORPORATION,

     Defendant-Respondent,

and

MOROLAKE ESI,

     Defendant.

_____

Argued March 11, 2024 – Decided March 21, 2024

Before Judges Mawla, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2613-20.

Anthony Santos Almeida argued the cause for appellant (Poulos LoPiccolo, PC, attorneys; Anthony Santos Almeida, of counsel and on the briefs).

John T. McDonald argued the cause for respondent (Reed Smith, LLP, attorneys; John T. McDonald and Saranne E. Weimer, on the brief).

PER CURIAM

Plaintiff Kimberly A. Zack appeals from a January 9, 2023 order granting summary judgment to defendant Integra Lifesciences Corporation (Integra). We affirm.

Plaintiff is a White woman who was employed as a manager at Integra in its New Jersey location. On June 14, 2020, during the protests of police violence following the murder of George Floyd, plaintiff posted statistics from a government website on her Facebook account showing police killed more Whites than Blacks. This sparked a discussion in the comments from many individuals, including some who worked for Integra.

In the comments, plaintiff stated that "it's so frustrating . . . [w]hat everyone fails to realize is that if you're home on the couch doing what you're supposed to be doing you won't ever be one of those numbers no matter what your race, religion, or political affiliation!" She also said, "regardless of what bucket you['re] in[,] if you were on the right side of the law[,] you wouldn't be on the list in the first place . . . . [T]his hate will continue as long as everyone keeps making it about skin color."

One of plaintiff's direct reports, a Black scientist at Integra, commented on the thread following plaintiff's post, stating it was "insensitive . . . comparing the 'current situation' to the statistics of those shot to death by police."  Another Black employee at Integra was also offended by the post and sent it to an Integra manager, Tyhesha Tidwell, who is also Black.  Tidwell is a Senior Manager at Integra's Boston, Massachusetts location.  She wrote the following in the Facebook comments:

> This entire conversation is painful, layered[,] and complex.  Lives lost cannot simply be reduced to numbers.  To couch it in just 'doing what you were supposed to do' or being on the 'right side of the law' misses the point.  If you truly want to engage in honest dialogue, you have many on your timeline who would probably help you see past the [W]hite privilege and [W]hite fragility on display in most of these comments.

The reporting employee told Tidwell this was not the first time plaintiff posted racially insensitive material on Facebook.  Tidwell testified at deposition that "[plaintiff] has a habit of saying racially insensitive things.  She has posted them on Facebook before."  Tidwell testified she would have a problem with the post if a Black person had made it "because as someone who understands math, this is not the best way to represent information, and this, especially at this time, was very incendiary."  She had not reported any of plaintiff's prior posts to

3

Integra, but she sent the June 14, 2020 post and ensuing comment thread to Integra's human resources department.

The matter was investigated by Morolake Esi, Integra's Head of Human Resources, Global Operations and Quality, and Lisa Evoli, Vice President of Human Resources. Evoli reviewed the post and comments, and determined plaintiff violated Integra's policies and expectations. The investigation also revealed plaintiff was already on a Performance Improvement Plan (PIP), for, among other things, unprofessional behavior, and had recently received a "Does Not Meet Expectations" review on her evaluation—in part for behavioral issues. After reviewing the Facebook post and plaintiff's history with Integra, Esi and Evoli concluded plaintiff's violation warranted termination. Evoli terminated plaintiff.

Plaintiff filed a complaint, alleging: reverse racial discrimination in violation of the New Jersey Law Against Discrimination (LAD) against Integra; reverse racial discrimination under the LAD against Esi; common law wrongful discharge (a Pierce claim)[1] based on the First Amendment to the United States Constitution and the New Jersey State Constitution; and violation of the New Jersey Civil Rights Act (CRA) based on interference with plaintiff's

_____

[1] Pierce v. Ortho Pharm. Corp., 84 N.J. 58 (1980).

employment. Defendants moved to dismiss the complaint in its entirety. On April 5, 2021, the court dismissed the CRA claim, but denied the motion regarding the remaining claims pending discovery.

Plaintiff amended her complaint, adding a count against Integra for violation of the LAD under a "cat's paw"/accommodating discriminatory views theory.[2] Following discovery, defendants again moved for summary judgment on all counts. Plaintiff conceded the dismissal of her claims against Esi, leaving the LAD, Pierce, and cat's paw claims asserted against Integra for adjudication.

On January 9, 2023, the motion judge granted summary judgment to Integra, dismissing all the remaining counts. He concluded plaintiff's termination was not the result of discrimination because her post violated Integra's company policy. There was no dispute about the contents of her post, but "[w]hat [she posted] doesn't show is the relative percentages of what [the] numbers [of persons shot] are to the population of those groups. And it is no surprise . . . that there would be an adverse reaction to that post." For plaintiff's reverse discrimination claim to survive summary judgment, she had to show Integra was the unusual employer who had a history of discriminating against Whites. The judge concluded the incident here was "singular" and there was

---

[2] We discuss the "cat's paw" theory of liability in detail in Section III.B.

"no evidence of any ongoing pattern . . . that [W]hites have been set upon by [Integra]."

I.

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540). We review a grant of summary judgment de novo, using the same standard that governed the trial court's decision. Samolyk v. Berthe, 251 N.J. 73, 78 (2022).

II.

Plaintiff argues the reverse discrimination claim should not have been dismissed because the LAD must be interpreted liberally. She asserts that our law, which requires a plaintiff alleging reverse discrimination to show their employer is the "unusual employer who discriminates against the majority," Erickson v. Marsh & McLennan Co., 117 N.J. 539, 551 (1990), is an overly

6

restrictive standard. Plaintiff urges us to abandon the unusual employer standard and follow the Third Circuit, which has held that as regards Title VII claims, "the prima facie case in terms of 'background circumstances' and the uniqueness of the particular employer is both problematic and unnecessary." Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999).

To establish a prima facie case of discrimination under the LAD, a plaintiff must show: 1) they are a member of a protected class; 2) they applied for or held a position for which they were objectively qualified; 3) they were either not hired or terminated by the employer; and 4) the employer sought to, or did fill the position with a similarly-qualified or less-qualified person. Bergen Com. Bank v. Sisler, 157 N.J. 188, 210 (1999) (quoting Erickson, 117 N.J. at 550). In employment discrimination cases, our courts have adopted the burden-shifting framework created by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973), which requires:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant must then show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.

A-1745-22

> [Henry v. Dep't of Hum. Servs., 204 N.J. 320, 331
> (2010) (quoting Dixon v. Rutgers, 110 N.J. 432, 442
> (1988)).]

In Erickson, our Supreme Court stated:

> In reverse discrimination cases, the rationale
> supporting the rebuttable presumption of
> discrimination embodied in the prima facie elements
> does not apply.  Thus, when a complainant is not a
> member of the minority, courts have generally modified
> the first prong of the McDonnell Douglas standard to
> require the plaintiff to show that [they have] been
> victimized by an "unusual employer who discriminates
> against the majority."  Indeed, when a complainant is a
> member of the majority and not representative of
> persons usually discriminated against in the work place,
> discrimination directed against that person is
> "unusual."

> [117 N.J. at 551-52 (citations omitted).]

In Iadimarco, the Third Circuit held that modifying McDonnell Douglas to include consideration of an employer's background circumstances presented a more onerous burden to White plaintiffs in Title VII claims.  190 F.3d at 159. However, our Supreme Court has stated:  "Although [there is] . . . a need to harmonize the LAD with Title VII in order to assure a reasonable degree of symmetry and uniformity in the law, 'we have not hesitated to depart from the [McDonnell Douglas] methodology if a rigid application of its standards is

inappropriate under the circumstances.'" Bergen Com. Bank, 157 N.J. at 212 (quoting Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 107 (1990)).

As an intermediate appellate court, we lack the authority to overturn Erickson. More importantly, Erickson was decided one year after Iadimarco, and our Supreme Court implicitly elected not to adopt the Third Circuit's approach in that case. We are bound by Erickson and its sound reasoning, which has remained unaltered for over three decades. See Flizack v. Good News Home for Women, Inc., 346 N.J. Super. 150, 158 (App. Div. 2001); Oakley v. Wianecki, 345 N.J. Super. 194, 201-02 (App. Div. 2001). The rule in Erickson—that discrimination against a member of the majority is unusual and therefore requires consideration of the background circumstances to understand whether the employer discriminates against Whites—is critical to discerning whether there was discrimination here.

The record is devoid of evidence of minority employees making posts like plaintiff's and not being terminated for the violation. Moreover, plaintiff failed to show Integra was the unusual employer who targets members of the majority. The only evidence she cites is Integra's African American Affinity Group (IAAAG), which Tidwell headed, and a message released by Integra's Executive

Leadership Team (ELT) on June 22, 2020, titled "ELT Reflections on Juneteenth." In it, Integra stated:

> The [ELT] met with members of the [IAAAG] last Friday and used this forum to listen, learn and discuss ways we can advance our culture of diversity and inclusion. As we reflected upon our conversation, one thing is clear: while we have made advancements in diversity and inclusion, there is still a lot of work to be done. . . . In the coming weeks, we will work closely with the IAAAG to establish specific actions to address the issues discussed.

Plaintiff notes Evoli signed the ELT statement.

None of this evidence established Integra discriminates against Whites. Rather, these initiatives are in accord with the LAD, and demonstrate Integra values diversity and promotes an inclusive work environment.

### III.

Plaintiff argues summary judgment was improperly granted because there were disputed issues of material fact, including whether: 1) she violated Integra's social media policy; 2) Tidwell violated the same policy; 3) Integra selectively enforced its policy based on plaintiff's race; 4) plaintiff and Tidwell are "similarly situated comparators"; 5) Tidwell wanted plaintiff terminated and "took the steps necessary to effect that termination"; and 6) Evoli "placated the . . . cat's paw, . . . [i.e.;] Tidwell." Plaintiff also asserts the motion judge

10

misapplied the summary judgment standard when he found no evidence of an ongoing pattern of reverse discrimination because a single incident can qualify as evidence of discrimination. She claims the judge impermissibly weighed the evidence and failed to draw all reasonable inferences in her favor on these points.

Plaintiff argues the evidence showed Integra treated her and Tidwell disparately. She asserts she is similarly situated to Tidwell because she is also a manager and subject to the same Integra social media policy. Yet Tidwell was not terminated for using racially charged terms like "[W]hite privilege" and "[W]hite fragility" in her Facebook post. Plaintiff also points to private text messages between Tidwell and other Black employees that negatively referenced plaintiff and her Facebook post as proof Integra is the unusual employer who engages in reverse discrimination.

A.

We reject the argument that a singular incident of alleged discrimination was enough to prove a discrimination claim. In Erickson, the Court denied a male plaintiff's reverse sex discrimination claim, which was based on a "singular incident of replacing" him with a female as "insufficient to demonstrate [the company was] the unusual employer who discriminates against the majority."

117 N.J. at 552. The Court held the plaintiff proffered "no evidence [his employer] engaged in a pattern of sex discrimination that favored women over men." Id. at 553.

None of the facts that plaintiff claims are in dispute would have thwarted summary judgment in favor of Integra. Plaintiff and Tidwell were not similarly situated. "A determination of whether employees are similarly situated takes into account factors such as an employee's job responsibilities, the supervisors and decision-makers, and the nature of the misconduct at issue." Wright v. Providence Care Ctr., LLC, 822 F. App'x. 85, 92 (3d Cir. 2020). See also Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 84-45 (1978); Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 305 (App. Div. 2000). Tidwell and plaintiff had different job titles and supervisors. They worked in different states.

Further, plaintiff engaged in misconduct, Tidwell did not. "To be deemed similarly situated[,] the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mosca v. Cole, 384 F. Supp. 2d 757, 766 (D.N.J. 2005) (quoting Bullock v. Child.'s Hosp., 71 F. Supp. 2d 482, 489 (E.D. Pa. 1999)).

12

Plaintiff presented no evidence Tidwell's use of the terms "[W]hite privilege" and "[W]hite fragility" were actionable and violated Integra's workplace policies. She only offered her opinion that she viewed Tidwell's comment as equally "inappropriate" as her own, and that Integra treated both women differently. However, there were differentiating and mitigating factors at play; plaintiff was under a PIP, and Tidwell had no disciplinary history.

Moreover, plaintiff's claim her post was not about race is belied by the fact the statistics were broken down by race, and her post was made at a time of national discussion about race and police violence. Therefore, plaintiff's comments that "if you're home on the couch doing what you're supposed to be doing you won't ever be one of those numbers" and "if you were on the right side of the law" were inappropriate because they minimized the moment in an insensitive manner as evidenced by the adverse reaction of several Black employees. Tidwell's response expressed that plaintiff's statements were hurtful and sought to initiate a discussion to explain why. Unlike plaintiff's statements, no one, inside or outside of Integra, complained about Tidwell's comment.

Notwithstanding their dissimilarities, even if plaintiff and Tidwell had the same disciplinary history, Integra was not obligated to treat their conduct in a similar fashion. "Where two individuals have violated the conduct policy in

13

different ways, an employer has the discretion to conclude that one was guilty of a more serious infraction than the other, and to treat the cases accordingly." Ewell v. NBA Props., 94 F. Supp. 3d 612, 627 (D.N.J. 2015).  For these reasons, we reject plaintiff's claims the judge was required to decide whether there was a violation of Integra's social media policy and if the company selectively enforced its policy.

B.

Plaintiff argues the motion judge erred when he dismissed the cat's paw claim because Tidwell's comment on plaintiff's Facebook post and her private communications showed Tidwell held discriminatory views, which then influenced Evoli's decision to terminate plaintiff.  She points to the fact Tidwell sent Evoli an email titled "Action Required," which contained a breakdown of and commentary on the Facebook post.

Tidwell's email said:  "I wanted to make you aware of a situation that occurred today, and I believe that action is needed.  At 1:00AM this morning, I was sent the following post by an Integra employee who used to work . . . for the person who posted this on Facebook."  She then provided screenshots of the Facebook post and comments, and added:

14

In response, I was told that this entire post was deleted within [fifteen to thirty] minutes of my comment.

At this point, I just feel that it is important that [Black] colleagues at Integra and elsewhere feel supported and safe by those in authority over our work lives. Although not angry, this is deeply disturbing to me, and I am hoping that you can let me know what[,] if anything[,] can be done. Employees should not have to fear that our leadership is tone deaf to this moment and this movement.

Forgive me for the long email. Please let me know if I can provide any other information. I fear that if we let these microaggressions remain unchecked, nothing will change. And what I know for sure is that after what we have experienced in the last few weeks in our country, nothing should stay the same.

"The cat's paw theory of liability applies to 'a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" Meade v. Twp. of Livingston, 249 N.J. 310, 334 (2021) (quoting Marshall v. Rawlings Co., LLC, 854 F.3d 368, 377 (6th Cir. 2017). Liability exists under this theory "only if a non-decisionmaker's [discriminatory] act proximately caused the firing." Crosbie v. Highmark, Inc., 47 F.4th 140, 145 (3d Cir. 2022). Proximate cause does not exist when the employer does not rely on the allegedly

biased act in taking the ultimate adverse action.  Jones v. SEPTA, 796 F.3d 323, 331 (3d Cir. 2015); see also Staub v. Proctor Hosp., 562 U.S. 411, 421 (2011).

Our de novo review of the record reveals no evidence of bias on Tidwell's part.  Rather, her email to Evoli attached plaintiff's postings and the comment thread, and relayed the fact plaintiff's actions made Black employees feel unsafe. Tidwell's private texts were revealed during discovery, and neither Esi nor Evoli had them when they were conducting the investigation or when the decision to terminate plaintiff was made.  Esi and Evoli investigated the case based on the objective evidence and Evoli made the termination decision based on the investigation.  The cat's paw theory did not apply here.

IV.

Plaintiff argues the decision to terminate her was merely a pretext for the reverse discrimination because Evoli conducted a "sham investigation" that did not comport with Integra's investigation policies.  She asserts the pretext was evidenced by the fact her termination was unprecedented, she received a good final performance review, and Integra's social media policy did not require termination in the event of a violation.

We do not reach this argument because plaintiff failed to establish a prima facie case of discrimination to trigger the burden shifting analysis and

consideration of pretext under <u>McDonnell Douglas</u>.  See <u>Crisitello v. St. Theresa Sch.</u>, 255 N.J. 200, 231 (2023) (Pierre-Louis, J., concurring) (stating the burden shifting begins "[o]nce a prima facie case of discrimination is established").

V.

Plaintiff urges us to abrogate our holding in <u>McVey v. AtlantiCare Medical System Inc.</u>, claiming it is internally inconsistent because we held state action was required to assert a claim for wrongful discharge based on a violation of the First Amendment right to free speech yet held "constitutional rights can be enforced against private entities."  472 N.J. Super. 278, 288 n.5 (App. Div. 2022).  She further asserts <u>McVey</u> "failed to substantively distinguish between the Fourth Amendment privacy rights implicated within the <u>Hennessey</u>[3] opinion with the First Amendment freedom of speech rights before it" and ignored that <u>Hennessey</u> held a <u>Pierce</u> claim could be sustained under the New Jersey Constitution's free speech provision.

Our Supreme Court has held that wrongful discharge cases "must balance the interests of the employee, the employer, and the public."  <u>Pierce</u>, 84 N.J. at 71.  "Employees have an interest in knowing they will not be discharged for exercising their legal rights," while "[e]mployers have an interest in knowing

---

[3]  <u>Hennessey v. Coastal Eagle Point Oil Co.</u>, 129 N.J. 81 (1992).

they can run their businesses as they see fit as long as their conduct is consistent with public policy," and "[t]he public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees." Ibid.

Our courts are "mindful that judicial intervention in the private employment context has a limited purpose. Anti-discrimination laws do not permit courts to make personnel decisions for employers. They simply require that an employer's personnel decisions be based on criteria other than those proscribed by law." Peper, 77 N.J. at 87.

In McVey, the plaintiff was terminated by an employer who operated a private hospital and health system for posting on Facebook "that she found the phrase 'Black Lives Matter' to be 'racist,' believed the Black Lives Matter movement 'causes segregation,' and asserted that Black citizens were 'killing themselves.'" 472 N.J. Super. at 281. The trial court dismissed McVey's complaint for wrongful discharge because the First Amendment and Article I, Paragraph 6 of the New Jersey Constitution did not bar a private employer from terminating her. Id. at 281-82.

On appeal, McVey acknowledged she did not have an absolute constitutional right to free speech in a private employment setting under Hennessey. Id. at 288. Her free speech rights, however, outweighed her

18

employer's right "to promote an inclusive, non-divisive environment for its clients and employees." Ibid.

We affirmed and rejected McVey's argument that she had the constitutional right to make her remarks under the United States Constitution. Ibid. We held "constitutional rights can be violated only if there is state action" and in McVey's case there was no state action because she worked for a private employer. Id. at 288-89. We did not need to distinguish between the First Amendment right raised by McVey and the Fourth Amendment right in Hennessey, because Hennessey did not turn on the Fourth Amendment. 129 N.J. at 95. Indeed, Hennessey held the Fourth Amendment is not implicated where there is no state action. Ibid.

Instead, Hennessey addressed and rejected a Pierce claim based on the right to privacy under the New Jersey Constitution. Ibid. The Court held a private employer did not violate an employee's constitutional right to privacy by mandating random urine screens for drugs and was not liable for wrongful discharge by subsequently terminating the employee where the employee failed the drug screen. Id. at 94-96, 107. This was because the employee worked and supervised others at an oil refinery, and public safety in the operation of the

refinery outweighed his right to privacy under the New Jersey Constitution. Id. at 104-07.

We likewise rejected McVey's Pierce argument, noting Hennessey held "more is needed than simply the breach of public policy affecting a single person's rights to constitute the breach of a 'clear mandate' of public policy that Pierce requires." McVey, 472 N.J. Super. at 287 (quoting Hennessey 129 N.J. at 99). Further, we noted although Hennessey found the New Jersey Constitution "'may' constitute public policy, it did not do so in that case." Ibid. We found "[n]o New Jersey court has held that a private entity that encroaches upon a private individual's constitutional rights to free speech has violated a clear mandate of public policy within the intendment of the Pierce and Hennessey paradigm." Id. at 289. "[T]he majority of courts . . . in other jurisdictions have precluded a private employee's Pierce claim based on a private employer's alleged infringement of free speech." Ibid.

McVey's free speech rights did not outweigh her employer's business interests because her racist remarks were not protected speech within the context in which they were made. Id. at 290. We found even if her remarks were adjudged under a lower standard and considered "to be merely insensitive, we would still hold under Hennessey that [her employer] properly terminated her

employment" because McVey's "interest in publicly posting her remarks was minimal." Ibid. Rather than posting her remarks privately, she did so publicly and "prominently identified" her title and employer. Ibid. McVey was aware of her employer's social media policy, which prohibited comments like the ones she posted and yet she "posted her remarks at the height of the [George] Floyd protest[s]" exposing her employer "to the possibility of unwanted and adverse publicity and criticism." Id. at 291. Under the circumstances, McVey's "slight interest in publicly making her position on the Black Lives Matter movement known" did not outweigh her employer's "strong interest in protecting and fostering" diversity or show the employer "violate[d] a clear mandate of public policy when it terminated McVey's employment." Ibid.

The facts here are quite similar. Even if we considered plaintiff's postings to be "merely insensitive," she made these remarks publicly and doubled down on them, notwithstanding Integra's social media policy. Plaintiff was identified as a member of Integra, and like McVey, her comments occurred at a time of national racial strife. Her comments brought that strife into Integra's work environment, undermining its diversity and inclusion practices and exposed Integra to possible unwanted public criticism. In these circumstances, plaintiff's posting and statements were neither constructive nor had a valid business

21

purpose. Therefore, her "slight" interest in free speech did not outweigh Integra's strong interest in ensuring a productive and inclusive work environment and the ability to assure partners, clients, and the public it did not share or endorse plaintiff's views. Thus, even if the motion judge had reached the Pierce claim, it would not survive summary judgment.

Finally, as regards the right to free speech under the United States Constitution, McVey was not internally inconsistent because we noted the limited exceptions to state action where constitutional rights could be enforced against private entities involved "political expressions at privately-owned-and-operated shopping malls and defamation." Id. at 288 n.5 (citation omitted) (quoting Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 265 (1998)). Those exceptions did not apply in McVey's case, and they do not apply here.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION